

U.S. Department of Justice

United States Attorney
Eastern District of New York

DCP:DG/SSS/GMM
F. #2016R02185

271 Cadman Plaza East
Brooklyn, New York 11201

March 12, 2020

By Hand and ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court
Eastern District of New York
Brooklyn, NY 11201

        Re:    United States v. Donville Inniss
                Criminal Docket No. 18-134 (S-2)(KAM)

Dear Judge Matsumoto:

        The government respectfully submits this letter in response to the defendant Donville Inniss's ("the defendant") motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. For the reasons set forth below, the defendant's motion should be denied.

        I.    Background

        On March 15, 2018, a grand jury returned a three-count indictment against the defendant. On August 22, 2018, the grand jury returned a three-count superseding indictment against the defendant and two co-conspirators, Ingrid Innes and Alex Tasker, and on August 1, 2019, the grand jury returned a second superseding indictment against the same three defendants ("the Superseding Indictment"). (Dkt. No. 50). Count One of the Superseding Indictment charged all three defendants with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Counts Two and Three charged all three defendants with substantive money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A). Each count charged the defendants with intending to promote the carrying on of an offense against a foreign nation involving bribery of a public official, in violation of the Prevention of Corruption Act of Barbados, Barbados' anti-bribery statute. Superseding Indictment ¶¶ 22, 24.

        The charges stemmed from a bribery and money laundering scheme in which the defendant, formerly Barbados' Minister of Industry, International Business, Commerce and Small Business and Development ("Minister of Industry") and a member of the Barbados Parliament, accepted bribes from Innes and Tasker, both of whom were senior executives at the Insurance Corporation of Barbados Ltd. ("ICBL"), an insurance company in Barbados. The

bribe payments were made to secure ICBL's business with the Barbados Investment and Development Corporation ("BIDC"), a Barbadian government agency that the defendant oversaw, and laundered through bank accounts in the United States.

II. The Trial

At trial, which began on January 13, 2020, the government introduced testimony from six witnesses and documentary evidence – including emails, text messages and bank records – establishing that, in 2015 and 2016, the defendant accepted two bribe payments from ICBL and laundered those payments through bank accounts in New York. A summary of the trial evidence is set forth below.

A. The 2015 Bribe

In 2015, the BIDC was deciding which insurance companies would insure its properties, which were worth more than $100 million. (See GX 123). The prior year, the BIDC had used three insurance companies: (i) ICBL, which had a 50% share of the BIDC's business; (ii) Consumers' Guarantee Insurance ("CGI"), which had 30%; and (iii) Trident Insurance ("Trident"), which had 20%. (Id.). CGI and Trident were competitors of ICBL. In March 2015, the BIDC management recommended that the BIDC continue the same insurance arrangement from 2014. (GX 111-A). Shortly after receiving this recommendation, the BIDC solicited proposals from insurance brokers for the BIDC business and, after receiving a number of proposals, in June 2015 the BIDC management again recommended that the BIDC "retain the current trio of insurers with the existing 50% (ICBL), 30% (CGI), & 20% (Trident) ratio." (GX 121).[1] However, according to BIDC board minutes, the board reversed course and, on June 22, 2015, decided to award ICBL a 70% share and CGI a 30% share. (See GX 125, 126).

In July 2015, the defendant met with Innes to discuss the renewal of ICBL's contracts with the BIDC.[2] (Trial Transcript ("T.") 167). At that time, Goulbourne Alleyne, the Deputy Chief Executive Officer of ICBL, had been in discussions with the BIDC's broker, CGM Gallagher Insurance ("CGM"), about the terms of ICBL's renewal contract. (T. 160-61). Alleyne testified that his role in the negotiation process was to work with the brokers and that Innes' role was to meet with the defendant. (Id.). After the defendant's meeting with Innes, Alleyne emailed Innes and asked her how the meeting went. (GX 35). Innes responded that the defendant "has given instructions to proceed with the insurance." (T. 168-69; GX 35).

---

[1] On June 4, 2015, the defendant emailed Sonja Trotman, the BIDC's Chief Executive Officer, and asked about the status of the BIDC insurance. (GX 32). The day before sending this email, the defendant received a text message from Tasker that stated: "We need to talk." (GX 39).

[2] In his role as Minister of Industry, the defendant oversaw the BIDC and appointed its board of directors. (See, e.g., GX 113, 139 (BIDC annual reports submitted to the defendant); GX 134 (letter regarding appointment of BIDC board of directors)).

In or about and between June 22, 2015 and July 15, 2015, the BIDC awarded and finalized the 2015 insurance contract to ICBL and CGI. (GX 37, 128, 130). ICBL received a 70% share and CGI received a 30% share. The term of the contract was from July 15, 2015 to April 1, 2016, and the total premium on ICBL's portion of the business was $661,469.30 Barbadian dollars. (GX 37).

In August 2015, Kamante Millar, the former Chief Financial Officer of ICBL, attended a meeting with Innes and Tasker in Innes' office. (T. 42). During the meeting, Innes told Millar that ICBL needed to make an urgent payment in U.S. dollars to the defendant for a "referral bonus." (T. 42-43, 45). Millar testified that a referral bonus was a term for payments that ICBL made to people – other than agents or brokers – who either referred new business to ICBL or took actions that would result in an existing policyholder renewing their business with ICBL. (T. 53). During the meeting, Millar told Innes and Tasker that it would not be possible to make an urgent payment in U.S. dollars from Barbados because the payment would need to be reviewed by the Financial Services Commission in Barbados. Millar therefore suggested that they make the payment through BF&M Ltd. ("BF&M"), ICBL's parent company in Bermuda, and Innes agreed. (T. 44-47).

After the meeting, Tasker gave Millar a piece of paper with bank account information for the payment. Specifically, the paper contained bank account information for a company called Crystal Dental Lab ("CDL") with an address in Elmont, New York. (T 51; GX 38). Tasker told Millar that CDL was the defendant's company in the United States. (T. 51). In reality, CDL was a dental company incorporated in New York and run by the defendant's associate, Roger Clarke. (See GX 92 – GX 92-S). It conducted no business with ICBL in 2015 or 2016. (T. 188-89).

After Tasker provided Millar with the CDL's bank account information, Millar asked Tasker how much the payment to the defendant would be. Tasker responded by telling Millar the amount of the premium on the insurance contract for which the defendant would be paid, and the rate for determining the defendant's payment. (T. 52). Using a calculator, Millar multiplied the premium times the rate and determined that the payment to the defendant would be $16,536.73. (T. 52, 54, 57). Millar then created a fake invoice from CDL to ICBL for that amount, and sent it to BF&M for processing. (T. 55; GX 41). The invoice was dated August 10, 2015. (GX 41).

In the days leading up to this meeting, the defendant had a number of communications with Tasker. Specifically, on August 5-6, 2015, the defendant and Tasker exchanged text messages about meeting in person and speaking on the phone. (GX 39). On August 9, 2015, Tasker sent the defendant a text message that stated, in part: "Do not forget to drop off the letter in the am." (Id.). The following day, August 10, 2015, the defendant sent himself an email, the subject of which was "bank," that included bank account information for an account in the name of CDL at Bank of America. (GX 40). That bank account information was the same account information that was on the paper that Tasker provided Millar, and that Millar then entered in the fake August 10, 2015 invoice from CDL to ICBL. (GX 41). The amount of the invoice – $16,536.73 – equaled exactly five percent of ICBL's premium ($661,469.30 Barbadian dollars, the equivalent of $330,734.65 U.S. dollars) on its 2015 contract with the BIDC. (T. 344-45).

3

On August 17, 2015, BF&M sent $16,536.73 to CDL's bank account in New York. (GX 44). Two days later, almost all of that money ($16,000) was deposited in a Bank of America account in the defendant's name. (GX 5, 18).

B. The 2016 Bribe

ICBL's 2015 contract with the BIDC ran through April 1, 2016. (GX 37). Four days later, on April 5, 2016, the defendant sent Tasker an email, the subject of which was "crystal invoice," attaching a $20,000 invoice from CDL to ICBL for "consultancy services" from June 2015 through February 2016. (GX 54, 54-A). The defendant sent the email to Tasker's personal email account and included no text in the body of the email. (GX 54). As noted above, CDL did not provide consultancy services or any services for ICBL in 2015 or 2016. (T. 188-89).

Around the same time that the defendant sent Tasker the $20,000 invoice, Tasker told Millar that the business the defendant had referred to ICBL in August 2015 was up for renewal and that ICBL needed to make a $20,000 payment to him. (T. 76). After Tasker gave Millar the premium amount for the contract and the rate for the referral, Millar calculated the payment based on those figures. (T. 76). Millar then asked why the payment was not the exact amount that she had calculated. Tasker told her that "we decided" to make a round payment. (Id.). Millar then pulled up the template for the invoice that she had created in August 2015, and created a second fake invoice from CDL to ICBL requesting a $20,000 payment for "consulting services" that were never provided. (T. 77; GX 51).

On April 7, 2016 – two days after the defendant emailed Tasker the CDL invoice for $20,000 – Millar emailed the invoice she had created to BF&M for processing and payment. (GX 55). During the next week, Millar, Innes and Tasker exchanged a number of emails about the payment to CDL. On April 11, 2016, Innes wrote to Tasker and told him to "verify that [th]is is paid only for icbl's portion asap." (GX 56). The following day, Tasker wrote that ICBL's "portion of the premium is $915982.90 via the broker." (Id.). Millar then responded to Tasker's email and requested that he send the "breakdown of the payment so I can attach to the support and tie the pieces back." (Id.). In response, Tasker sent a document regarding the insurance of BIDC's properties and wrote that Millar should "pay attention to page 8." (Id.). Page 8 of the document provided ICBL's premium on its 2016 contract with the BIDC. (GX 56-A).

On April 18, 2016, BF&M sent $20,000 to CDL's bank account in New York. (GX 58). Approximately one week later, almost all of that money ($19,750) was deposited into the defendant's bank accounts in the United States. The funds were divided into three payments ($9,000, $8,000 and $2,750) and deposited into three different accounts in the defendant's name. (See GX 2, 6, 14, 16).

C. The End of the Scheme

In October 2016, BF&M's Chief Financial Officer, Michael White, contacted BF&M's Chief Executive Officer, John Wight and told him that BF&M's Finance Department had discovered the two payments to CDL and was investigating them. (T. 143). During a subsequent phone conversation, John Wight questioned Innes and Tasker about the purpose of

4

the two payments and told them that the payments were bribes. After the call, Innes said "Oh my God, I can get fired for this." (T. 101-103). During that same time period, Innes told Alleyne that the payments to CDL were for BIDC business. (T. 190).

### III. The Verdict

On January 16, 2020, after four days of trial and approximately two hours of deliberations, the jury found the defendant guilty on all counts.

### IV. Defendant's Rule 29 Motion

On February 22, 2020, the defendant filed a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29. (Dkt. Nos. 111-12). In his motion, the defendant acknowledges that there was "clear evidence of the money from Barbados to a third party in the United States and back into Donville Inniss' bank account" but contends that "there was no trial testimony upon which the jury could properly infer that the conduct of Donville Inniss was part of a scheme to induce a bribe." (Dkt. No. 112 ("Def. Decl.") at 3). The defendant further contends that there was "insufficient evidence to establish a benefit that was an inducement to, reward for or otherwise on account of, doing of forbearing to do anything." (Id. at 3-4). Finally, the defendant contends that "there was insufficient evidence to demonstrate that the payments were corrupt; a payment for a favorable vote." (Id. at 4). As discussed below, these claims are meritless.

### V. Applicable Law

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." See Fed. R. Crim. P. 29(c). As the Second Circuit has observed, to upset a jury verdict, the defendant bears a heavy burden:

> In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. In considering such a challenge, we must credit every inference that could have been drawn in the government's favor and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt. We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence. Pieces of evidence must be viewed not in isolation but in conjunction, and the conviction must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

United States v. Reifler, 446 F.3d 65, 94-95 (2d Cir. 2006) (citations and quotation marks omitted); United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993) ("It is well established that a defendant challenging the sufficiency of the evidence underlying a conviction bears a very heavy burden.") (internal citations omitted). In assessing sufficiency, a court is "obliged to view

the evidence in its totality and in the light most favorable to the prosecution." United States v. Florez, 447 F.3d 145, 154-55 (2d Cir. 2006).

In resolving a Rule 29 motion, a court "must be careful to avoid usurping the role of the jury." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (internal citation omitted); see also Florez, 447 F.3d at 154-55 (in evaluating evidence in connection with a Rule 29 motion, courts must be "mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court"); United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir. 1992) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments."); United States v. Barret, No. 10-CR-809 (KAM), 2012 WL 3229291, at *16 (E.D.N.Y. Aug. 6, 2012). The Second Circuit has cautioned courts not to usurp the jury's role because "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008).

In addition, as the Second Circuit has made clear, trial courts may grant a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)); see also United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant a Rule 29 motion for insufficiency only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"); United States v. Greebel, No. 15-CR-637 (KAM), 2018 WL 3900496, at *23 (E.D.N.Y. Aug. 14, 2018). "[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" Guadagna, 183 F.3d at 129.

Furthermore, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir.2004)); see also United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006) ("A jury may convict on circumstantial evidence alone."); accord United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003); United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995). When making a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt." Holland v. United States, 348 U.S. 121, 139 (1954); see also Rosenthal, 9 F.3d at 1024 ("The government need not eliminate every theory of innocence, and the reviewing court must consider pieces of evidence not in isolation, but in conjunction."); United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991).

VI.     Argument

The defendant's Rule 29 motion essentially contends that there was insufficient evidence upon which the jury could find that the defendant intended to promote a violation of the Prevention of Corruption Act of Barbados. The defendant is incorrect. As set forth below, there

6

was more than sufficient evidence upon which a rational jury could find that the defendant intended to promote a violation of this anti-bribery statute.[3]

First, there was overwhelming evidence that both payments to the defendant were for ICBL's contracts with the BIDC, i.e., the government agency that the defendant oversaw. The August 2015 payment to CDL was $16,536.73 – exactly five percent of the premium ICBL was to be paid under its 2015 contract with the BIDC. (T. 344-45). Millar testified about how she calculated that number: Tasker provided her with the premium and the rate and she multiplied the two numbers. (T. 52, 54, 57). It was plainly rational for the jury to conclude that the premium Tasker provided was for the BIDC contract. Indeed, that is the only plausible explanation for how Millar arrived at that exact number. This demonstrates that the payment was for the defendant's role in ensuring the contract went to ICBL.

The April 2016 payment was also directly linked to the BIDC contract. When Tasker told Millar that ICBL had to make another payment to CDL, he said that it was because the business the defendant had referred was up for renewal. (T. 76). As set forth above, that business was with the BIDC. Finally, in addition to the clear documentary evidence showing that both payments were for BIDC contracts, Innes admitted to Alleyne that the payments to CDL were for BIDC business. (T. 190). In sum, there was more than sufficient evidence from which the jury could conclude that the payments to the defendant were for government contracts. In other words, that they were bribes.

Second, contrary to the defendant's contention, there was more than sufficient evidence that the payments were an "inducement to, reward for or otherwise on account of doing or forbearing to do anything." (Def. Decl. at 3-4). Whether described as inducements for ensuring that ICBL won the BIDC contract or rewards for having done so, the payments were plainly on account of the defendant "doing or forbearing to do anything" with regard to government contracts awarded by the agency he oversaw. Indeed, Innes admitted that the payments to the defendant were for BIDC business. (T. 190). And the evidence established that the defendant gave "instructions to proceed" with the ICBL contract (T. 168-69, GX 35) – a contract that gave ICBL a 20% greater share of the BIDC business than it had in 2014. But even if the defendant had done nothing at all, as the Court instructed the jury, "it does not matter

---

[3] The district court instructed the jury on Barbados' anti-bribery statute, including the following elements of a violation of that law:

> First, that the receiving person corruptly solicited, received or agreed to receive; Second, the receipt was any gift, loan, fee, reward or advantage whatsoever; Third, the gift, loan, fee, reward or advantage was for the benefit of himself or anyone else; Fourth, that the benefit was an inducement to, reward for or otherwise on account of doing or forbearing to do anything; Fifth; the receiver was any member, officer or servant of the Crown or of a public body of Barbados; and Sixth, that the benefit was in respect of any matter or transaction whatsoever, actual or proposed, in which the Crown or public body is concerned.

(T. 533-34).

7

[under the Prevention of Corruption Act of Barbados] whether the public official actually performed the act or refrained from performing the act in question." (T. 535). There was more than sufficient evidence for the jury to conclude that the ICBL executives sent approximately $36,000 to a dental company in New York for the defendant's benefit for a reason – because they believed that the defendant would secure ICBL's business with the BIDC.

   Third, in addition to the above evidence tying both payments to the BIDC contracts, there was substantial evidence of the numerous steps that the defendant and his co-conspirators took to hide the payments, all of which further reflected their illicit nature. For the first bribe payment, the defendant emailed himself CDL's payment information (GX 40); met Tasker in person to provide him with the payment information in hard copy; (GX 38; 39); omitted any reference to himself in the document he provided Tasker (GX 38); and had the payment sent to CDL instead of to himself – even though he had multiple U.S. bank accounts in his own name. (GX 4, 13). Similarly, for the second bribe payment, the defendant emailed a fake invoice from CDL to Tasker's personal email account, instead of to his ICBL email account (GX 54); again omitted any reference to himself in the invoice (GX 54-A); requested payment for "consultancy services" that were never provided (id.; T. 188-89); and, after the payment was in CDL's bank account in New York, deposited it into three separate bank accounts in his own name (GX 2, 14, 16). All of these steps that the defendant took to hide the payments provided additional bases upon which the jury could conclude that the payments were, in fact, bribes.

   Finally, the defendant's suggestion that the government had to prove that the payments were for a "favorable vote" is incorrect. (Def. Decl. at 3). Whether the payments were for a favorable vote, an "instruction[] to proceed" (GX 35), or on "account of doing or forbearing

to do anything," (T. 533), they were payments to a public official for government contracts. As such, they were payments intended to promote the violation of Barbados' anti-bribery law.

   VII. Conclusion

  For the reasons set forth above, the defendant's motion should be denied.

          Respectfully submitted,

         RICHARD P. DONOGHUE
         United States Attorney

By:  /s/
   David Gopstein
   Sylvia Shweder
   Assistant U.S. Attorneys
   (718) 254-6153/6092

   ROBERT A. ZINK
   Chief, Fraud Section
   Criminal Division
   U.S. Department of Justice

By:  /s/
   Gerald M. Moody, Jr.
   Trial Attorney
   U.S. Department of Justice
   (202) 616-4988

cc: Anthony Ricco, Esq., and Steven Legon, Esq. (by ECF)