UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

                                **MEMORANDUM & ORDER**

    v.

                                18-cr-134 (KAM)

DONVILLE INNISS,

       *Defendant.*
----------------------------------X

**MATSUMOTO, United States District Judge**:

        On January 16, 2020, a jury in the Eastern District of New York found Donville Inniss ("Mr. Inniss") guilty of one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and two counts of substantive money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A).  Mr. Inniss now moves for a judgment of acquittal on all three counts of conviction, pursuant to Federal Rule of Criminal Procedure 29(c)(2) ("Rule 29(c)(2)").  For the reasons set forth below, Mr. Inniss's motion is respectfully DENIED.

**STANDARD OF REVIEW**

        Rule 29(c)(2) of the Federal Rules of Criminal Procedure provides that a district court shall enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction.  *See* Fed. R. Crim. P. 29.  A defendant challenging the sufficiency of the evidence to support his conviction "'bears a heavy burden.'"  *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir. 2001) (quoting *United*

1

*States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)); *see also United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990) (stating that motions to challenge sufficiency of evidence "rarely carry the day").

In determining whether to grant a motion for judgment of acquittal, the district court must view the evidence in the light most favorable to the prosecution. *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006). "All permissible inferences must be drawn in the government's favor." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). The court must ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Temple*, 447 F.3d at 136 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Put another way, '[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Id.* (quoting *Guadagna*, 183 F.3d at 130).

Further, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v.*

2

*Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004). When making a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt." *Holland v. United States*, 348 U.S. 121, 139 (1954); *see also United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993) ("The government need not eliminate every theory of innocence, and the reviewing court must consider pieces of evidence not in isolation, but in conjunction.").

The Second Circuit has "emphasized that courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing *Guadagna*, 183 F.3d at 129 ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.")); *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (same). It is the jury's task, not the court's, to "choose among competing inferences that can be drawn from the evidence." *Id.* (citing *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)). "These principles apply whether the evidence being reviewed is direct or circumstantial." *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir. 1990); *see also Jackson*, 335 F.3d at 180 ("[Courts must] bear in mind that the jury's verdict may rest

3

entirely on circumstantial evidence."). "[I]f the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Guadagna*, 183 F.3d at 129.

## DISCUSSION

Mr. Inniss challenges the sufficiency of the evidence on all three counts of conviction regarding whether defendant (1) was part of a scheme to induce a bribe and (2) whether the payments to defendant were corrupt or represented payments for a favorable vote. (ECF No. 112, Ricco Decl. at 3-4; ECF No. 112-1, "Def. Mem." at 3.)  Both grounds essentially argue that there was insufficient evidence at trial for the jury to conclude that defendant intended to promote a violation of the Prevention of Corruption Act of Barbados.  (ECF No. 113, "Gov. Mem." at 6-7.) For the reasons set forth below, the court finds that there was sufficient evidence for a rational trier of fact to have found the essential elements of the crimes of conviction, beyond a reasonable doubt.  Consequently, the court respectfully denies Mr. Inniss's motion for a judgment of acquittal.

Although defense counsel acknowledges "there were text messages and emails . . . and clear evidence of the money transfers from Barbados to a third party in the United States and back into Donville Inniss' bank account," defense counsel contends that "there was no trial testimony upon which the jury

4

could properly infer that the conduct of Donville Inniss was part of a scheme to induce a bribe, an essential element of each count[.]"  The court disagrees.

As set forth below, the government presented substantial evidence at trial that both bribe payments to Mr. Inniss were made to secure the Insurance Corporation of Barbados Ltd.'s ("ICBL") contracts with the Barbados Investment and Development Corporation ("BIDC"), a Barbadian government agency that Mr. Inniss oversaw, in his position as the former Barbados Minister of Industry, International Business, Commerce and Small Business and Development ("Minister of Industry") and a member of the Barbados Parliament.

Evidence Regarding the August 2015 Payment

First, the government presented evidence that, in July 2015, Mr. Inniss met with Ms. Innes, who was at that time the CEO of ICBL, to discuss the renewal of ICBL's contracts with the BIDC.  (Trial Transcript ("TT") 167.)  On or about and between June 22, 2015 and July 15, 2015, the BIDC awarded and finalized the 2015 insurance contract to ICBL and Consumers' Guarantee Insurance ("CGI"), in which ICBL received a 70% share and CGI received a 30% share.  (GX 37, 128, 130.)  The contract term was from July 15, 2015 to April 1, 2016, and the total premium on ICBL's portion of the business was $661,469.30 Barbadian dollars, *i.e.* $330,734.65 USD.  (GX 37.)

5

In August 2015, Kamante Millar, the former Chief Financial Officer of ICBL, attended a meeting with Ms. Innes and Mr. Tasker, then-Senior VP of ICBL. (TT 42.) During the meeting, Ms. Innes told Ms. Millar that ICBL needed to make an urgent payment in USD to Mr. Inniss for a "referral bonus." (TT 42-43, 45.) After the meeting, Mr. Tasker provided Ms. Millar with the bank account information for Crystal Dental Lab's ("CDL"), a New York-based dental company operated by defendant's associate, Roger Clarke. (*See* GX 92 and GX 92-S.) CDL conducted no business with ICBL in 2015 or 2016. (TT 188-89.) Mr. Tasker instructed Ms. Millar to send defendant $16,536.73, which was the amount determined by multiplying the premium on the contract by a rate. (TT 52-55, 57.) Ms. Millar further testified that she created a fake invoice dated August 10, 2015 from CDL to ICBL for $16,536.73, and sent the invoice to BF&M Ltd. ("BF&M"), ICBL's parent company in Bermuda, for processing. (TT 55; GX 41.)

In the days leading up to the meeting between Ms. Millar, Mr. Tasker, and Ms. Innes, defendant had several communications with Mr. Tasker. On August 5-6, 2015, defendant and Mr. Tasker exchanged text messages about meeting in person and speaking on the phone. (GX 39.) On August 9, 2015, Mr. Tasker sent defendant a text message that stated, in part: "Do not forget to drop off the letter in the am." (*Id.*) On August

6

10, 2015, defendant sent himself an email, with subject line "bank," that included bank account information for an account in the name of CDL at Bank of America. (GX 40.) That bank account information matched the account information that was on the paper that Mr. Tasker provided Ms. Millar, and that Ms. Millar entered in the fake August 10, 2015 invoice from CDL to ICBL. (GX 41.) Notably, the amount of the invoice - $16,536.73 – equaled exactly five percent of ICBL's premium, $330,734.65 USD, on its 2015 contract with the BIDC. (TT 344-45.) On August 17, 2015, BF&M sent $16,536.73 to CDL's bank account in New York. (GX 44.) Two days later, most of that money, $16,000, was deposited in a Bank of America account in defendant's name. (GX 5, 18.)

Evidence Regarding the April 2016 Payment

As previously noted, ICBL's 2015 contract with the BIDC ran through April 1, 2016. (GX 37.) Four days after the contract had expired, on April 5, 2016, Mr. Inniss sent Mr. Tasker a blank email, with subject line "crystal invoice," attaching a $20,000 invoice from CDL to ICBL for "consultancy services" from June 2015 through February 2016. (GX 54, 54-A.) As noted above, CDL did not provide consultancy services or any services for ICBL in 2015 or 2016. (TT 188-89.)

Also in April 2016, Mr. Tasker told Ms. Millar that the business that defendant had referred was up for renewal, and

7

that ICBL needed to make a $20,000 payment to defendant. (TT 76.) After Mr. Tasker gave Ms. Millar the premium amount for the contract and the rate for the referral, Ms. Millar calculated the payment based on those figures. (*Id.*) Ms. Millar asked why the payment was not the exact amount that she had calculated. Mr. Tasker responded that "we decided to round up." (*Id.*) Ms. Millar then pulled up the template for the fake invoice that she had created in August 2015, and created a second fake invoice from CDL to ICBL, requesting a $20,000 payment for "consulting services" that were never provided. (TT 77; GX 51.)

On August 7, 2016, Ms. Millar emailed the invoice she had created to BF&M for processing and payment. (GX 55.) On April 11, 2016, Ms. Innes wrote to Mr. Tasker to "verify that [th]is is paid only for icbl's portion asap." (GX 56.) The next day, Mr. Tasker wrote that ICBL's "portion of the premium is $915982.90 via the broker." (*Id.*) Ms. Millar replied to Mr. Tasker's email, requesting that he send the "breakdown of the payment so I can attach to the support and tie the pieces back." (*Id.*) In response, Mr. Tasker sent a document regarding the insurance of BIDC's properties and instructed that Ms. Millar "pay attention to page 8." (*Id.*) Page eight of the attached document provided ICBL's premium on its 2016 contract with the BIDC. (GX 56-A.)

On April 18, 2016, BF&M sent $20,000 to CDL's bank account in New York. (GX 58.) Approximately one week later, most of that money, $19,750, was deposited into Mr. Inniss's bank accounts in the United States. The funds were divided into three payments - $9,000, $8,000 and $2,750 – and deposited into three different accounts in defendant's name. (GX 2, 6, 14, 16.)

In October 2016, BF&M's Chief Financial Officer, Michael White, contacted BF&M's Chief Executive Officer, John Wight, informing him of two payments made by the Finance Department to CDL. (TT 143.) During a subsequent phone conversation, Mr. Wight questioned Ms. Innes and Mr. Tasker about the purpose of the two payments and stated that the payments were bribes. (TT 102-03.) After the call, Ms. Innes stated, "[O]h, my God. I can get fired for this." (*Id.*) Subsequently, in late October 2016, Mr. Goulbourne Alleyne, an ICBL employee, testified that Ms. Innes told him that a payment to CDL was "made for BIDC business." (TT 190.)

Based on the foregoing, the court finds that there was more than sufficient evidence for the jury to find that the 2015 and 2016 payments by ICBL to Mr. Inniss were directly linked to the BIDC contracts. Further, the payment amounts were evidence that the payments to Mr. Inniss were a reward for ICBL's securing two contracts with the BIDC. As noted above, the

9

August 2015 payment to CDL of $16,536.73 represented exactly five percent of the premium ICBL was to be paid under its 2015 contract with the BIDC.  (TT 52-55, 57, 344-45.)  Though the April 2016 payment was not exactly five percent of the premium ICBL was to be paid under its renewed contract with the BIDC, there was sufficient evidence for the jury to find that the payment was made as a bribe to secure the contract. Additionally, after meeting with Mr. Inniss, Mr. Tasker told Ms. Millar that ICBL needed to make another payment to CDL because the business that defendant had referred was up for renewal. (TT 76.)  Furthermore, toward the end of 2016, Ms. Innes admitted to Mr. Alleyne that the payment to CDL was for BIDC business.  (TT 190.)

The evidence also established that Mr. Inniss gave "instructions to proceed" with the ICBL contract, which allocated to ICBL a 20% greater share of the BIDC business than it had in 2014.  (TT 168-69; GX 35.)  As the government correctly notes, under the Prevention of Corruption Act of Barbados, evidence that the public official actually performed the act or refrained from performing the act is unnecessary. (TT 533-35.)  In any event, there was sufficient evidence for the jury to conclude that the ICBL executives transferred approximately $36,000 to CDL in New York for Mr. Inniss's

10

benefit because they believed that Mr. Inniss would secure ICBL's business with the BIDC.

In addition, there was substantial evidence at trial regarding the steps Mr. Inniss and ICBL executives took to hide the payments, which reflected their illicit nature. For the first bribe payment, Mr. Inniss emailed himself CDL's payment information (GX 40), met Mr. Tasker in person to provide him with the payment information in hard copy, which omitted any reference to himself (GX 38 and 39), and had the payment sent to CDL instead of directly to himself – even though he had multiple U.S. bank accounts in his own name. (GX 4 and 13.) For the second bribe payment, Mr. Inniss emailed a fake invoice from CDL to Mr. Tasker's personal email account, instead of to his ICBL email account (GX 54), again omitted any reference to himself in the invoice (GX 54 and TT 188-89), and, after the payment was in CDL's bank account in New York, had the funds deposited into three separate bank accounts in his own name (GX 2, 6, 14, and 16). Evidence of the steps that defendant took to hide the payments provided further bases upon which the jury could rationally conclude that the payments were bribe payments intended to promote the violation of Barbados' anti-bribery law.

**CONCLUSION**

For the foregoing reasons, the court **denies** Mr. Inniss's motion for a judgment of acquittal. Sentencing of Mr. Inniss will take place on **Monday, November 23, 2020 at 11:00 a.m.**

**SO ORDERED.**

Dated:   July 24, 2020
         Brooklyn, New York

                                    _____/s/_____
                                    Hon. Kiyo A. Matsumoto
                                    United States District Judge