**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**vs.**

**DONVILLE INNISS,**

    **Defendant.**

_____/

## DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR A REASONABLE SENTENCE

Defendant, **DONVILLE INNISS ("Inniss")**, by and through undersigned counsel, hereby files this Sentencing Memorandum and asks this Court to impose a reasonable sentence, all facts and circumstances considered.

## I.    INTRODUCTION

In light of the mitigating factors set forth herein, Inniss respectfully requests this Court to impose a probationary sentence and extensive community service. Such a sentence would be sufficient – but not greater than necessary – to satisfy the factors outlined in 18 U.S.C. § 3553(a). See Kimbrough v. United States, 552 U.S. 85, 101 (2007). With the exception of the improper conduct at issue here, Inniss has led an exemplary and law-abiding life. Inniss' extensive charitable works and meritorious community involvement, his low risk of recidivism, the significant emotional, psychological, public and private embarrassment, as well as the negative impact on him which he will continue to face as a result of his conduct all provide ample justification for the Court to impose a probationary sentence, though it is below the "presumptively not reasonable"

advisory sentencing guideline range. <u>United States v. Cavera</u>, 550 F.3d 180, 189 (2d. Cir. 2008) (a district court may not presume that a sentence within the Guidelines range is reasonable).

## II.    **PROCEDURAL HISTORY**

1.      On March 15, 2018, the Government filed a three-count Indictment against Inniss charging him with one (1) count of conspiracy to launder money in violation of 18 U.S.C. 1956(h) (Count 1) and two counts of money laundering in violation of 18 U.S.C. 1956(a)(2)(A) (Counts 2–3). (D.E. 1).

2.      On August 23, 2018, the Government filed a three-count Superseding Indictment against Inniss charging him again with one (1) count of conspiracy to launder money in violation of 18 U.S.C. 1956(h) (Count 1) and two counts of money laundering in violation of 18 U.S.C. 1956(a)(2)(A) (Counts 2–3). (D.E. 13).

3.      On August 1, 2019, the Government filed a Second Superseding Indictment against Inniss charging him once again with one (1) count of conspiracy to launder money in violation of 18 U.S.C. 1956(h) (Count 1) and two counts of money laundering in violation of 18 U.S.C. 1956(a)(2)(A) (Counts 2–3). (D.E. 50).[1]

4.      On January 16, 2020, a jury convicted Inniss of all three counts alleged in the Second Superseding Indictment after the conclusion of a four-day trial. (D.E. 106).

5.      On July 24, 2020, this Court initially set Inniss sentencing hearing for November 23, 2020, (D.E. 115), which was subsequently reset to April 27, 2021 to give undersigned counsel sufficient time to prepare for the sentencing, <u>see</u> Scheduling Order on December 16, 2020.

---

[1] The difference between the March 15, 2018, August 23, 2018, and August 1, 2019, indictments is the theory of specified unlawful activity (i.e., an underlying violation of the Foreign Corrupt Practices Act) which was absent from the initial Indictment, included in the first Superseding Indictment, and later dismissed by Government motion. <u>See</u> D.E. 25 (Motion to Dismiss FCPA Specified Unlawful Activity Theory).

# III.    ADVISORY GUIDELINES CALCULATIONS

## A.    UNCONTESTED GUIDELINE PROVISIONS

U.S.S.G. §2S1.1 is the applicable guideline for violations of 18 U.S.C. § 1956. All three Counts are grouped under U.S.S.G. §3D1.2(a) because they involve the same acts or transactions, as well as under U.S.S.G. §3D1.2(d) because the offense level is determined largely on the basis of the total amount of aggregate loss.

Pursuant to U.S.S.G. §2S1.1, the base offense level is determined by the guideline for the underlying offense, which is U.S.S.G. §2C1.1 (receiving a bribe). Accordingly, the base offense level is fourteen (14). See U.S.S.G. §2C1.1(a)(1). Another four (4) levels are added pursuant to the table in U.S.S.G. §2B1.1 because the value of the payments was more than $15,000 but less than $40,000. See U.S.S.G. §2C1.1(b)(2). The base offense level is increased by four (4) more levels under U.S.S.G. §2C1.1(b)(3) because Inniss was a public official in a high-level decision-making or sensitive position. Two (2) levels are also added because Inniss was convicted under 18 U.S.C. 1956. See U.S.S.G. §2S1.1(b)(2)(B).

Consequently, it is agreed that Inniss' nonbinding merely "advisory," presumptively not reasonable total offense level should be, at least, twenty-four (24).

## B.    CONTESTED GUIDELINE PROVISIONS

The Government asserts the total offense level should be twenty-eight (28), which results in an advisory guideline range of seventy-eight (78) to ninety-seven (97) months. Not only does this advisory guideline range grossly overstate the seriousness of the offense, but it would also result in a disproportionate and extensively lengthy sentence for a first-time, non-violent offender.

The Government contends that a two (2)-level enhancement is appropriate pursuant to U.S.S.G. §2C1.1(b)(1) because the offense conduct allegedly involved more than one bribe, as

well as a two (2)-level enhancement pursuant to U.S.S.G. §2S1.1(b)(2)(B) because the offense allegedly involved "sophisticated" laundering. We disagree.

### 1.     The Offense Did Not Involve More Than One Bribe

The Government maintains the two (2)-level enhancement pursuant to U.S.S.G. §2C1.1(b)(1) applies because Inniss received two payments, in two separate years. The Government's interpretation of the agreement between the Barbados Investment Development Corporation ("BIDC") and Insurance Corporation of Barbados Limited ("ICBL") is either fundamentally flawed or clearly contradicted by the facts.

Application Note 6 of U.S.S.G. §2C1.1(b)(1) provides that related payments which, in essence, constitute a single incident of bribery (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts. While the Government chose to charge Inniss separately for these two payments (Count 2 for the 2015 payment and Count 3 for the 2016 payment), the two payments—even viewing all facts and inferences in favor of the Government—were purportedly made to influence a **single action**—the maintenance of the previously existing, years-long business relationship between ICBL and BIDC.

The Second Circuit considers three factors in determining whether multiple payments constitute a single bribe: (1) were the payments made to influence a single action, (2) do the pattern and amount of payments bear the "hallmarks" of installment payments, such as regular payments made toward a fixed sum, and (3) was the method for making the payment the same (i.e., the payments involve the same payor/payee in each instance, and whether payments are made in the same form and by the same means). See United States v. Arshad, 239 F.3d 276, 280-82 (2d Cir. 2001).

Here, the evidence introduced at trial demonstrated the contract between the BIDC and ICBL was for two years. See Government Exhibit 127 attached hereto as Exhibit A (Letter from Samuel Harrison, Business Development Officer (BDO) of the BIDC to Stephen Ollivierre, Managing Director of Sentry Insurance Brokers Ltd. (SIBL) dated June 24, 2015); see also Government Exhibit 128 attached hereto as Exhibit B (Letter from Samuel Harrison, BIDC's BDO to Michael Tomlin, Managing Director of CGM Gallagher Insurance Brokers (Barbados) Ltd. dated June 29, 2015); Government Exhibit 133 attached hereto as Exhibit C (Letter from Stephen Ollivierre, Managing Director of CGM Gallagher Insurance Brokers to Sonja Trotman, Chief Executive Officer of the BIDC dated March 24, 2016).

Indeed, in the June 24, 2015 letter Harrison, BIDC's BDO sent to Stephen Ollivierre (Ollivierre), Managing Director of Sentry Insurance Brokers Ltd., Harrison explicitly stated that the engagement between the insurance brokers, insurance companies, and the BIDC was to last for **twenty-four months**, provided that there was no change in the premium paid during the last twelve months of the contract. See Exhibit A. On June 29, 2015, Harrison, as BIDC's BDO sent the same message to Michael Tomlin, Managing Director of CGM Gallagher Insurance Brokers (Barbados) Ltd (CGM). See Exhibit B. Subsequently, on March 24, 2016, Ollivierre, Managing Director of CGM sent a letter to Sonja Trotman, the BIDC's CEO, further confirming that the engagement between the brokers, insurance companies, and BIDC was for a two-year period. See Exhibit C. As such, the evidence clearly demonstrated that the contract was intended to last two years, thus, even assuming the two payments made to Inniss were illegal, they were installment payments made to influence a single action—the maintenance of the relationship between ICBL and BIDC.

For approximately twenty-five (25) years prior to 2009, ICBL held the entire insurance portfolio of the BIDC. With the introduction of brokerage services to the BIDC in 2009, the ICBL

has competed with other insurance companies for the BIDC's business. Since then (2009-2021), ICBL has been the lead insurer and retained between 55 – 70% of the BIDC portfolio. Since Inniss' arrest, the BIDC has maintained ICBL as its lead insurer, evidencing the ICBL's competitive advantage over other insurers and longstanding relationship with the BIDC.

Again, assuming <u>arguendo</u> the payments constituted bribes, the method for calculating the value of same remained fixed throughout the relevant period. According to the Government, each amount was determined by multiplying a certain percentage by the value of the insurance premium for a particular year. Moreover, the amount of the specific payments was apparently based on the total amount of the insurance premiums. Finally, the manner in which the payments were made remained consistent—ICBL wired funds to Crystal Dental Lab both times.

Therefore, the facts of this case demonstrate that an enhancement under U.S.S.G. §2C1.1(b)(1) should not apply.

### 2. The Offense Conduct Was Not Sophisticated

The sophisticated laundering enhancement is inappropriate in this case. The enhancement is applicable when a defendant's scheme, viewed as a whole, is "notably more intricate than that of a garden-variety" scheme. <u>See</u> <u>United States v. Cole</u>, 296 F. App'x 195, 197 (2d Cir. 2008). It is not easy to define the term "sophisticated means." To an extent, it is a subjective determination. What one court views as sophisticated means may not be so viewed by another court. But virtually every scheme prosecuted by the U.S. Government has, of necessity, an element or degree of "sophistication." You get money, you transfer it almost always surreptitiously, you spend (or save) it.

While this case concerns alleged money laundering, an analysis of the enhancements based on sophistication in prosecutions for other economic crimes is supportive of our position. In <u>United</u>

States v. Rice, 52 F.3d 843, 844 (10th Cir. 1995), the defendant was a certified public accountant. He set up two Subchapter S Corporations and treated himself as an employee of each. IRS records showed that these S Corporations did not file employee withholding forms or pay withholding taxes. Yet, the defendant's personal tax return showed deductions as if such payments had been made. The Government argued that his acts constituted "a complicated scheme of tax fraud involving several Subchapter S Corporations he established." Id. at 844. The Tenth Circuit found that "for three consecutive years, the defendant employed a **fairly complicated scheme** to receive tax refunds." Id. at 850 (emphasis added). Nonetheless, the Tenth Circuit concluded that the conduct was not sophisticated tax evasion and did not warrant a sentencing enhancement. Id. at 849.

In United States v. Adepoju, 756 F.3d 250 (4th Cir. 2014), the defendant was convicted of bank fraud and aggravated identity theft. Although the defendant used forged checks and a stolen identity to attempt the bank fraud, the Fourth Circuit found that the sophisticated means enhancement was unwarranted, stating that "sophistication requires more than the concealment or complexities inherent in fraud." Id. at 257 (internal citation omitted); see also United States v. Montano, 250 F.3d 709, 715 (9th Cir. 2001) (finding that because smuggling necessarily involves concealment, sophisticated means requires more than what is necessary to commit the crime); United States v. Garcia, 939 F. Supp. 2d 1155, 1215 (D. NM 2013) (finding that although a co-defendant created false invoices, he did not do so in a particularly complex fashion that made detection of the offense difficult, and therefore a sophisticated means enhancement was unwarranted).

Assuming arguendo the payments constituted bribes, the actions of the parties involved here were (1) not sophisticated and (2) typical for the charged offense. Specifically, the conduct

did not entail multiple levels of layering or integration to disguise the source of the proceeds. There was a blatantly obvious and traceable "paper trail." No fictitious entities, false names, or shell corporations were utilized. Moreover, it is undisputed that Inniss was not responsible for executing the steps necessary to receive the payments. That responsibility fell squarely on Kamante Millar, Alex Tasker, and Ingrid Innes.

It cannot be the case that in every instance of money laundering, the sophisticated laundering enhancement is applicable. Such a result would double-count and penalize every defendant for conduct already accounted for in the base offense level under U.S.S.G. §2C1.1(a)(1)). Rare indeed is it that the recipient of illegally or fraudulently obtained funds retains the funds openly, publicly, in the same manner and forum as how and where received; (the only exception is cash, which is not the case here). The concept of sophistication is built into the guideline range for the underlying crime. To find this particular scheme to be "sophisticated" is to "double dip" the guidelines.

## C.    TOTAL OFFENSE LEVEL

For the reasons set forth above, Inniss' total offense level should be twenty-four (24), not twenty-eight (28). A total offense level of twenty-four (24) and criminal history category of I results in an advisory sentencing guideline range of fifty-one (51) to sixty-three (63) months imprisonment. However, that range continues to overstate the seriousness of this offense. And as further noted below, several mitigating factors support a far lower sentence as being reasonable.

## IV.    <u>REQUEST FOR A REASONABLE SENTENCE</u>

As this Court well knows, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." <u>Nelson v. United States</u>, 555 U.S. 350, 352 (2009) (emphasis on original); <u>Cavera</u>, 550 F.3d at 189 (a district court may not presume that a

sentence within the Guidelines range is reasonable). "The corollary of that proposition is that district judges have an obligation to consider whether a sentence other than a Guidelines sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing" under 18 U.S.C. § 3553(a). See United States v. Corsey, 723 F.3d 366, 382 (2d. Cir. 2013) (Underhill, J., concurring).

Moreover, unless otherwise prohibited by law, this Court "may consider, without limitation, any information concerning the background, character and conduct of [a] defendant." U.S.S.G. § 1B1.4; see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

18 U.S.C. § 3553(a) obliges the Court, "in determining the particular sentence to be imposed[,]" to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to—
>
>> (A)     reflect the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense;
>>
>> (B)     provide adequate deterrence to criminal conduct;
>>
>> (C)     protect the public from future crimes of the defendant; and
>>
>> (D)     provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
>
> (3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

        \*        \*        \*        \*

(5) any pertinent policy statement—

        \*        \*        \*        \*

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)–(7).

Inniss respectfully asks this Court to look beyond the advisory sentencing guidelines range and instead focus on the principles pronounced by the United States Supreme Court and the factors set forth in 18 U.S.C. § 3553(a), and thereafter impose a reasonable sentence.

## A.  MITIGATING FACTORS

### 1.  THE GUIDELINES OVERSTATE THE SERIOUSNESS OF THE OFFENSE

The underlying basis for the Government's prosecution of Inniss—that his conduct violated the Prevention of Corruption Act of Barbados—confirms that while this offense was serious, it certainly is not the most serious of offenses for which a total offense level between 24 and 28 is established. For example, if Inniss had been convicted of stealing more than $9,500,000 but less than $25,000,000 from an individual, his total offense level would still approximately be 28. See U.S.S.G. §§2B1.1(a)(2), 2B1.1(b)(1)(K), 2B1.1(b)(2)(A). Even if Inniss had assaulted someone with a gun, causing them serious bodily harm, under the aggravated assault guideline his total offense level would only be 26. See U.S.S.G. §§2A2.2(a), and 2A2.2(b).  Here, there were no

physical victims, and to the extent that any harm resulted from this offense (and none did), it did not affect *this* community—or the Barbadian community for that matter. See United States v. Whitehead, 532 F.3d 991, 993 (9th Cir. 2008) (affirming a downward variance to probation in a case involving the sale of counterfeit access cards in violation of the Digital Millennium Copyright Act based in part on the District Court's finding that the defendant's crime "[di]d not pose the same danger to the community as many other crimes").

To be sure, corruption is a serious crime, and the need to root out such behavior in our society is more pronounced now than ever before. However, Inniss has not been charged with any violation of the Prevention of Corruption Act in his home country, where presumably the greatest interest in prosecuting such violations would or should be.

ICBL is firmly entrenched as the largest insurance provider in Barbados and enjoys significant competitive advantages as a result of its status. Of the all the insurers competing for the BIDC's business, it is undisputable that ICBL offered the best terms and was least likely to face liquidity/solvency problems in the face of potential catastrophic loss to the BIDC's properties. See Government Exhibit 126 attached hereto as Exhibit D at 2 (BIDC Board Meeting Minutes on June 22, 2015, stating same). It is clear the Barbadian community and the BIDC did not suffer any harm from the allegations against Inniss or the conduct at issue.

The advisory guidelines range here is a classic example of how multiple overlapping guidelines interact to produce unreasonable sentences. This is especially true in this case, given that Inniss is a first-time, non-violent offender. The United States Sentencing Commission has acknowledged that "as more and more adjustments are added to the sentencing rules, it is increasingly more difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." See "Fifteen Years of Guidelines Sentencing: An Assessment

of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform," United States Sentencing Commission (November 2004) at 137-38.[2] There is also "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." See Adelson, 441 F. Supp. 2d. at 514. However, "the bare assertion of the need to deter, unconnected to the background and characteristics of a defendant or the nature and circumstances of a crime, provides only superficial support for a sentence of imprisonment." Corsey, 723 F.3d at 381. (Underhill, J., concurring). We have made that "connection" here.

The Court should also bear in mind the significant collateral consequences Inniss has already faced as a result of his conviction. See United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate 'just punishment' if it does not consider the collateral effects of a particular sentence."). His political career is over. Prospects of future employment are significantly diminished given his age and the stigma associated with a felony conviction. Id. (approving a variance from guidelines of 78-97 months to 20 months because defendant's conviction impacted his ability to pursue a career as an academic or translator). Since his arrest and even more so since his conviction, Inniss has been (1) restricted to the Middle and Southern Districts of Florida and Eastern District of New York (for Court appearances), (2) worn an ankle monitor and (3) separated from most of his family and friends for the past thirty-two (32) months. He also has not been able to complete his Doctoral degree coursework at Walden University or find employment.

"Ultimately, '[t]he touchstone of "reasonableness" is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." See

---

[2] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf

United States v. Tomko, 562 F.3d 558, 568 (3d. Cir. 2009) (citation omitted). As established above, the Government's position and Probation Office's calculations of the federal sentencing guidelines grossly overstate the seriousness of this crime.

## 2. THE HISTORY AND CHARACTERISTICS OF DONVILLE INNISS

Congress has directed that a defendant's personal characteristics should be considered equally with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Yet these factors are given no weight in the guidelines calculation; indeed, the Guidelines recognizes only the defendant's criminal record (providing for higher offense levels for a greater criminal history, rather than reductions for no prior record). See Rita v. United States, 551 U.S. 338, 364-65 (2007) ("The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are. . . matters that § 3553(a) authorizes the sentencing judge to consider."); see also United States v. Prosperi, 686 F.3d 32, 39 & 45 (1st Cir. 2012) (affirming a downward variance from an advisory guideline range of 87–108 months to home detention because the guidelines did not take into account the personal characteristics of the defendant); United States v. Martin, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on the defendant's "personal qualities indicating his potential for rehabilitation"). Therefore, we urge the Court to balance the presumptively not reasonable federal sentencing guideline calculations by giving fair and due consideration to the history and characteristics of Inniss that weigh heavily in favor of a significantly below-guidelines sentence.

Donville O'Niel Inniss was born on January 1, 1966, in the island nation of Barbados. Inniss grew up in poverty as one of eight siblings in a small fishing village named Bayfield. His father, Joseph, was a fisherman and his mother, Jasmine, a homemaker. Despite his family's humble lifestyle, Inniss' parents instilled in him the importance of family, faith, and of caring for others and giving to the community. Inniss' ambition and motivation to better the lives of his family and those in his community enabled him to make something of himself. In many ways his story, prior to the events of this case, is one of success and triumph over the hardships those living in island nations endure on a daily basis. Indeed, Inniss has prioritized teaching his own sons, Kofi and Kyle, the value of hard work, dedication, and the role that sacrifice plays in the journey of life.

Inniss attended public school throughout his life, eventually enrolling at the University of the West Indies in Barbados, where he majored in Public Sector Management and also served as the President of the Barbados Student Association. After completing his bachelor's degree, Inniss obtained his master's degree in business administration because he understood that an education provided his only sustainable escape from poverty. Besides ensuring that his sons would have access to the best education possible, Inniss has dedicated significant time throughout his life to helping the less fortunate obtain educations of their own. Inniss was raised in the Anglican Church in Barbados, where he assisted as an alter server and with the Sunday School classes. He also served as President of one of the Rotary Clubs in Barbados, providing voluntary community service to the young and needy in Barbadian society before entering the world of politics. A more detailed description of Inniss' community involvement and charitable acts is set forth in Section 3 (Inniss' Charitable Works and Extensive Public Service).

As a proud Barbadian, Inniss' decision to enter the political arena was motivated by his love of country and desire to give back and improve the lives of his fellow countrymen. While his

roles as a Member of Parliament and Minister of Industry, International Business, Commerce, and Small Business Development in Barbados always occupied a substantial amount of his time, Inniss' primary concern always has been, and always will be, his family and community. When asked what accomplishment he is most proud of, Inniss is quick to say his two sons, followed closely by his decision to marry his wife, Gail, with whom Inniss has been for over thirty (30) years.

We urge this Court not to define Donville Inniss by the conduct at issue here. In its remarks on the effect of incarceration on first-time, nonviolent offenders, the First Circuit in <u>Prosperi</u> recognized the punishment inherent to those who are thrust into the criminal justice system:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

686 F.3d at 48.

Inniss' personal characteristics and life history cry out for significant mitigation.

### 3. INNISS' CHARITABLE WORKS AND EXTENSIVE PUBLIC SERVICE

Courts have recognized that a defendant's charitable works and community involvement can justify a downward departure or variance. <u>See</u> <u>United States v. Thurston</u> 544 F.3d 22 (1st Cir. 2008) (affirming District Court's sentence of 3 months rather than 60-month guideline term for Medicare fraud conspiracy of more than $5 million, citing, among other things, defendant's charitable work, community service, and generosity with his time); <u>United States v. Cooper</u>, 394 F.3d 172 (3d Cir. 2005) (affirming 4-level downward departure to probation in securities fraud and tax evasion case based on defendant's good works where guidelines called for 14-21 months;

defendant did not simply donate money to charity but made "hands on personal sacrifices which have a dramatic and positive impact on the lives of others."); United States v. Serafini, 233 F.3d 758 (3d Cir. 2000); United States v. Woods, 159 F.3d 1132 (8th Cir. 1998) (defendant's exceptional charitable efforts, in taking in two troubled young women, financing their private education, and assisting an elderly friend's move from a nursing home, justified a downward departure).

Inniss has devoted a substantial amount of his time and resources giving back to those in need. During his tenure as a Member of Parliament, Inniss (1) organized annual luncheons for Easter, Christmas, and Mother's Day to celebrate the members of his community; (2) established a community funeral grant to help his constituents defray the burial costs for their loved ones; (3) arranged benefit concerts and distributed gifts to children, the disabled, and senior citizens during the holiday season; and (4) coordinated volunteer environmental cleanup efforts. Inniss cares deeply about ensuring Barbadian youth have access to education, and he was heavily involved in financially assisting the West Terrace Primary School and other schools. Inniss donated sporting equipment for cricket, soccer, tennis teams, netball, and dominoes teams as well as contributions to the costs of training and educational activities, often with his own funds, sometimes with third party donations or contributions. Every year, Inniss religiously donated school supplies to the children of his constituency (St. James South).

These are just a few of the ways that Inniss has devoted his efforts to helping the less fortunate, and Inniss hopes the Court will see that he is not a man motivated by greed or personal gain, but rather someone who genuinely cares for others and strives to help those in need:

> "If ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing

the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"

United States v. Adelson, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), aff'd 301 Fed. Appx 93 (2d Cir. 2008).

### 4. INNISS' AGE AND PRECARIOUS HEALTH

"While the Guidelines discourage the use of age as a reason for departure . . . it is entirely rational to consider this factor in setting a sentence in the Court's discretion." See Emenegger, 329 F.Supp.2d at 428; see also United States v. Pepper, 562 U.S. 476, 504 (2011) (remanding for resentencing because court of appeals erred in "categorically precluding" the District Court from exercising its discretion based upon policy disagreements); United States v. Simmons, 568 F.3d 564, 569 (5th Cir. 2009) (remanding for reconsideration because the district court erroneously believed that it could not disagree with the guideline policy statement regarding age because "Kimbrough does not limit the relevance of a district court's policy disagreement with the Guidelines to the situations such as the cocaine disparity and whatever might be considered similar").

Inniss suffers from hypertension, obstructive sleep apnea, type 2 diabetes, and high cholesterol. He is currently prescribed a regiment of medications for each of these ailments. Along with his age (55 years old), this combination of conditions places Inniss at risk of contracting a severe case of COVID-19. The World Health Organization explained that, "individuals at highest risk for severe disease and death include people aged over 60 years **and those with underlying conditions such as hypertension, diabetes, cardiovascular disease, chronic respiratory disease and cancer.**" See Report of the WHO-China Joint Mission on Coronavirus Disease 2019

(COVID-19), World Health Organization (Feb. 28, 2020), at 12 (emphasis added)[3]. The CDC has reported that, during a study of COVID-19 patients conducted in March of 2020, "approximately 90% of hospitalized patients identified…had one or more underlying conditions, the most common being obesity, hypertension, chronic lung disease, diabetes mellitus, and cardiovascular disease." See Centers for Disease Control, Morbidity and Mortality Weekly Report (April 8, 2020), Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019–COVID-NET, 14 States, March 1–30, 2020.[4]

Older inmates, particularly those first incarcerated at an older age, have a much different experience of incarceration than younger inmates, and their specific needs are not generally addressed by typical correction programs. Moreover, in the event a custodial sentence of length, is imposed, there is a strong likelihood of Inniss falling quite ill, possibly even perishing in prison, should he contract a severe case of COVID-19 due to his underlying health issues. Inniss respectfully asks the Court to be mindful of his age and health when fashioning its sentence. It should also be noted, that if placed on probation and permitted to return (or involuntarily deported) to Barbados, Inniss is entitled to free healthcare in his homeland.

## 5. INNISS' LOW LIKELIHOOD TO RECIDIVATE

In 2004, the Federal Sentencing Commission published a report which presented a statistical analysis of the characteristics associated with the likelihood of a person recidivating. The study showed that (1) those sentenced under economic crime guidelines were less likely to recidivate than those sentenced under other guidelines; (2) individuals over the age of fifty (50)

---

[3] See: https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with Covid-19 and comorbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").
[4] See: https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf

were the least likely to reoffend; (3) first-time offenders were less likely to recidivate than repeat offenders; (4) those who were employed were less likely to recidivate than those who were unemployed; (5) non-drug users were less likely to recidivate than drug users; (6) married individuals were less likely to reoffend compared to those that had never been married or were divorced; (7) college graduates were significantly less likely to reoffend than those with lower levels of educational attainment; and (8) people who received non-incarcerative sentences were less likely to reoffend than those who received sentences involving incarceration. See "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines," United States Sentencing Commission (May 2004) at 28-32.[5] Each of these aforementioned factors strongly supports a finding that Inniss poses virtually no risk of reoffending.

The Eleventh Circuit discussed the likelihood of recidivating in United States v. Clay, 483 F.3d 739 (11th Cir. 2007). In Clay, the District Court sentenced the defendant to 60 months, even though his guidelines were 188-235 months, as a result of the District Court's view that the defendant was not likely to re-offend. Id. at 742-43. In affirming the defendant's sentence, the Eleventh Circuit stressed that a sentencing Court is "require[d] . . . to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." Id. at 745. Because the defendant in that case had "fundamentally changed since his offense" and "pose[d] a lesser risk to the community," the Eleventh Circuit determined that the sentencing court was correct in issuing a variance. Id. at 746. See also Gall v. United States, 552 U.S. 38, 57–59 (2007); United States v. Cherry, 487 F.3d 366, 369–70 (6th Cir. 2007) (granting significant downward variance from the guideline range where the defendant presented a low risk to

---

[5] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

reoffend); <u>Prosperi</u>, 686 F.3d at 48 (affirming non-incarcerative sentence where there was no risk of recidivism).

Inniss is not a U.S. citizen and is thus subject to the inevitable immigration removal proceedings, further reducing the infinitesimal likelihood of him reoffending. <u>See</u> <u>United States v. Morales-Uribe</u>, 470 F.3d 1282, 1287 (8th Cir. 2006) (observing that "the need to protect the public from a defendant may be reduced in a case where, upon immediate release from incarceration, the Government will deport the defendant"); <u>See</u> <u>United States v. Emmenegger</u>, 329 F.Supp.2d 416, 428 (S.D. NY 2004) (considering fact that, unlike many alien offenders, defendant entered the United States legally and emigrated from a country that is not a source of substantial illegal immigration into the U.S., which made it "highly unlikely" that he would sneak back into the United States to commit additional crimes after deportation).

Inniss respectfully requests the Court, when fashioning his sentence, to consider his extremely low likelihood of reoffending.

## V.     <u>CONCLUSION</u>

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate . . . the crime and the punishment to ensue." <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996). For the reasons stated above, the facts and circumstances of this case and, Inniss' personal history, individual characteristics, charitable and community works, previous unblemished record, age and health warrant the imposition of probation, which would be a reasonable sentence though it is below the presumptively not reasonable advisory sentencing guideline range.

Respectfully submitted,

**GRAYROBINSON, P.A.**
Attorneys for Defendant
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
joel.hirschhorn@gray-robinson.com

By:     <u>s/Joel Hirschhorn</u>
       JOEL HIRSCHHORN
       Florida Bar #104573

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 30, 2021 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

s/Joel Hirschhorn       <br>
JOEL HIRSCHHORN

# EXHIBIT A



**BARBADOS INVESTMENT & DEVELOPMENT CORPORATION**

**Ref. 02/1/1**

June 24, 2015

# BIDC

This is to certify that this is a true copy of the original document.

MONICA MASON-CRICHLOW
Attorney-at-Law

Mr. Stephen Ollivierre J.P.
Managing Director
**SENTRY INSURANCE BROKERS LTD.**
37 Pine Road
Belleville
St. Michael

Dear Sir:

### Re: <u>Award of Contract for Property Insurance Brokerage Services to BIDC's Estates</u>

We write to advise that the Board of Management at its meeting held on June 22nd 2015 has awarded the above-captioned contract to CGM Gallagher Insurance Brokers (Barbados) Ltd. and Sentry Insurance Brokers Ltd. on a co-brokerage basis.

Please note the following details which will form part of the terms of your engagement with the Corporation:-

| | |
|---|---|
| Start date: | July 01, 2015. |
| Completion date: | June 30, 2017. |
| Contract Duration: | 24 months provided there is no change in the premium during the last 12 months of the Contract. |
| Co-Brokerage Terms: | CGM Gallagher Insurance Brokers (B'dos) Ltd. shall be the lead broker and Sentry Insurance Brokers Ltd. shall be the Co-Broker Insurers. |
| Proposed Coverage: | ICBL: 70% and CGI: 30%. |

Further to the above-stated information, please submit to us your Conditions of Engagement to finalize the terms of your Engagement with the Corporation. Please sign the attached copy of this letter accepting the terms as outlined.

Yours faithfully,
**BARBADOS INVESTMENT AND DEVELOPMENT CORPORATION**

Samuel Harrison
Business Development Officer (Technical)
Property & Estates Management Department
Investments & Properties Division

SH/vc

Sign: _____
Managing Director, Sentry Insurance Brokers Ltd.

**GOVERNMENT
EXHIBIT
127
18 CR 134 (S-2)(KAM)**

DOJ-CDL-000513787

DOJ-CDL-000513788

# EXHIBIT B



BARBADOS INVESTMENT & DEVELOPMENT CORPORATION

**Ref. 02/1/1**                                                      June 29, 2015

This is to certify that this is a true copy of the original document.

MONICA MASON-CRICHLOW
Attorney-at-Law

Mr. Michael Tomlin
Managing Director
**CGM GALLAGHER INSURANCE BROKERS (BARBADOS) LTD**
Haggatt Hall
St. Michael

Dear Sir:

### Re: Award of Contract for Property Insurance Brokerage Services to BIDC's Estates

We write to advise that the Board of Management at its meeting held on June 22nd 2015 has awarded the above-captioned contract to CGM Gallagher Insurance Brokers (Barbados) Ltd. and Sentry Insurance Brokers Ltd. on a co-brokerage basis.

Please note the following details which will form part of the terms of your engagement with the Corporation:-

| | |
|---|---|
| Start date: | July 01 2015. |
| Completion date: | June 30, 2017. |
| Contract Duration: | 24 months provided that there is no change in the premium during the last 12 months of the Contract. |
| Co-Brokerage Terms: | CGM Gallagher Insurance Brokers (Barbados) Ltd. shall be the lead broker and Sentry Insurance Brokers Ltd. shall be the Co-Broker Insurers. |
| Proposed Coverage: | ICBL: 70% and CGI: 30%. |

Further to the above-stated information, please submit to us your Conditions of Engagement to finalize the terms of your Engagement with the Corporation. Please sign the attached copy of this letter accepting the terms as outlined.

Yours faithfully,

**BARBADOS INVESTMENT AND DEVELOPMENT CORPORATION**

Samuel Harrison
Business Development Officer (Technical)
Property & Estates Management Department
Investments & Properties Division

SH/vc

GOVERNMENT
EXHIBIT
**128**
18 CR 134 (S-2)(KAM)

DOJ-CDL-000513790

# EXHIBIT C

  

**CGM Gallagher**
Insurance Brokers
(Barbados) Limited

**SENTRY**
INSURANCE BROKERS

March 24, 2016

Mrs. Sonja Trotman
Chief Executive Officer
Barbados Investment and Development Corporation
Pelican House
Princess Alice Highway
St. Michael

| BIDC Records Management Centre | |
| --- | --- |
| Received | 30 MAR 2016 |
| Action | Dir Finance |
| FYI | Chief Acct. |
| ER/EM | 2016-03-31 AB |

Dear Mrs. Trotman,

### Re- Property Renewal Terms for the Period 2016 to 2017

Please see below the renewal terms for your property insurance for period 2016 to 2017.

**Current Insurers –**    Insurance Corporation of Barbados – Share 70%
Consumers Guarantee Insurance –    Share 30%

**Values of Properties**  Bds$331,277,720.94

**Annual Premium-**    Bds $1,224,876.43

This is to certify that this is a true
copy of the original document.

MONICA MASON-CRICHLOW
Attorney-at-Law

Based on the Tender Proposal submitted in 2015 for the duration of two years the annual premium submitted was **$1,224,876.43** based on the value of **$331,277,720.94** (appendix A attached). As per your request to ensure that the renewal coincides with your financial year, the policy period was prorated from 15th July, 2015 to 31st March, 2016 and a pro rated premium of **$894,902.10** was charged .

This year your Insurers offered the renewal premium of **$1,224,876.43** for the annual premium. The reason we highlighted the premium charged last year was to show that difference in premiums charged was due to the pro rated premium charged for last period compared to the annual premium charged this year.. All other terms and conditions remain the same .

CGM Gallagher Insurance Brokers Barbados Limited and Sentry Insurance Brokers Limited will continue to service the account with the high level of service to which you have been accustomed from us. We have attached the schedule of properties for easy reference.

We trust that you are satisfied with the renewal terms, should any queries arise, please do not hesitate to contact us. We are available to meet and discuss at your convenience.

Kind regards,

Rosalind Bowen
Vice President

Stephen Ollivierre
Managing

docSTAR

**GOVERNMENT
EXHIBIT
133**
18 CR 134 (S-2)(KAM)

DOJ-CDL-000513835

DOJ-CDL-000513836

# EXHIBIT D

This is to certify that this is a true
copy of the original document.

MONICA MASON-CRICHLOW
Attorney-at-Law

CONFIDENTIAL

## BARBADOS INVESTMENT AND DEVELOPMENT CORPORATION

### MINUTES OF CONTINUATION OF BOARD MEETING NO. 6/2015
### Monday, June 22, 2015
### Conference Room, BIDC

**PRESENT:**

| | | |
|---|---|---|
| Mr. Benson Straker | - | Chairman |
| Mr. Junior Allsopp | - | Deputy Chairman |
| Mr. Erskine Thompson | - | Director |
| Mr. Adrian Padmore | - | Director |
| Mr. Paul Gibson | - | Director |
| Mrs. Karlene Nicholls | - | Director/BMA Representative |
| Mr. Philmore Best | - | Director/Permanent Secretary, Ministry of Industry, International Business, Commerce and Small Business Development |

**ABSENT:**

| | | |
|---|---|---|
| Mrs. Gail Niles | - | Director |

**IN ATTENDANCE:**

| | | |
|---|---|---|
| Mrs. Sonja Trotman | - | Chief Executive Officer |
| Mrs. Monica Mason-Crichlow | - | Legal Officer/Board Secretary |
| Ms. Julia Deane | - | Executive Secretary/Recording Secretary |

**WELCOME AND PRAYER**

The Chairman welcomed everyone and called the meeting to order at 2:06 p.m. Board Director, Mr. Thompson then led the meeting in prayer.

## 7. INSURANCE COVERAGE FOR CORPORATION'S BUILDINGS – BP 2015/62

The Director, Finance – Mr. Dwaine Stuart was invited to join the meeting to present Addendum to BP 2015/62.

The Addendum To Board Paper - Insurance Brokerage Services For The BIDC's Property Portfolio - BP 2015/62 presented a comparative table to assist in the analysis of the tenders received for the property insurance brokerage firm to manage the Corporation's portfolio.

GOVERNMENT
EXHIBIT
**126**
18 CR 134 (S-2)(KAM)

MMC
June 27, 2019

DOJ-CDL-00051378

After much discussion, it was noted as recommended that Insurance Corporation of Barbados Limited (ICBL) had consistently quoted the lowest premium and was the only A- rated company willing to underwrite 100% of the BIDC portfolio. In that willingness, they indicated that they would seek their own reinsurers. Empirical Insurance Brokers Inc. presented the lowest quote from ICBL which was for fire and full perils coverage only, and was therefore not recommended. The lowest all risk quotation was obtained by CGM Gallagher Insurance Brokerage Ltd. which was one of the Corporation's current brokers and thus intimately familiar with the operations and peculiarities of the asset portfolio.

*The Board agreed that the insurance portfolio would be awarded to the Insurance Corporation of Barbados Limited (ICBL) and Consumers' Guarantee Insurance (CGI) as insurers on a 70:30 ratio for a $1,224M split.*

*The Board further agreed that insurance brokerage would be shared brokerage, with CGM Gallagher Insurance Brokerage Ltd. as lead broker, and Sentry Insurance Brokers as co-broker.*

*In the event that either party as outlined above declines the offer then Lynch Insurance Brokers would move into the declining party's position at CGM's rate or a rate no greater than $4.1M.*

*The Board approved the coverage to take effect for two (2) years provided that there were no changes in premiums over that period.*

## 8. REPORT FROM TENDERS AND ESTATES COMMITTEE

### 8.1. BIDC'S CURRENT CONTRACTORS' LISTING

*This item was deferred to the Tenders and Estates Committee.*

*It was noted that the Corporation would move to institute minor works contracts by way of letters for Purchase Orders; and contracts for larger jobs.*

### 8.2. CAPITAL PROJECTS REPORTS

*This item was noted by the Tenders and Estates Committee.*

## 9. REPORT FROM EXPORT AND ENTREPRENEURIAL COMMITTEE

### 9.1. STRATEGIC PLAN FOR THE BARBADOS CRAFT SECTOR 2015-2018 – BP 2015/40

*The Board noted the three year plan for the sector, but recommended that focus should be placed on the activities for Year 1 and its tangible deliverables.*

2

DOJ-CDL-000513782

### 9.2. INVESTIGATION OF REGIONAL TRADE PROMOTION AGENCIES – BP 2015/41

*No discussion took place in relation to this matter. Item deferred for discussion by the Board.*

### 10. ANY OTHER BUSINESS:

The Director (Ag.), Export Development and Promotion – Mrs. Fern Lewis was invited to join the meeting to present BP 2015/59 and Addendum to BP 2012/3.

### 10.1. REQUEST FOR APPROVAL FOR A TURNAROUND PLAN FOR THE DINING CLUB INC. – BP 2015/59

This paper sought approval to undertake a turnaround plan for The Dining Club Inc. which could lead to the company regaining profitability whilst devising a payment plan that delivered sustained payments to the BIDC, new revenue streams for the client and additional benefits to the hospitality industry.

It was believed that the client was not exploring all revenue streams with respect to the food business, and there was opportunity for foreign exchange generation via sponsorship and an enhanced company profile. The Corporation may, however, be required to incur certain aspects of costs in undertaking the turnaround management of the company, e.g upgrade facilities to meet HACCP Compliance.

*Some of the concerns about the company raised by the Board included:*

i. *Strong financial management was required as there was no proper accounting system in place;*

ii. *2006 to 2011 financial statements showed a combined $1.5M in losses, updated audited financials were therefore required for an analysis of the company's performance over the last five (5) years;*

iii. *A separation and assessment of all individual outlets was required to determine the cost centres;*

iv. *Succession planning was required to develop a strong core management team to give guidance to the entire business;*

v. *An appropriate business model was required.*

*The Board agreed that:*

i. *The client would be charged a rental fee of $10,000 per month, being $8,000 for the downstairs facility and $2,000 for the upstairs studio and conference room which must continue to be used for the development of young persons;*

3

DOJ-CDL-000513783

ii. *Updated audited financials to outline the financial condition of the company would be provided to the Board by August 17, 2015. This would allow for the determination of a firmer proposal for the restructuring of the company;*

iii. *If approved, the turnaround plan would be implemented, and a reprieve on the rent would be instituted until the restructuring is completed;*

iv. *A determination for debt forgiveness would be made after implementation and assessment of the turnaround plan;*

v. *The Corporation must notify the client that BIDC reserves the right to have the Dining Club enter into a payment plan to collect the outstanding rent once the turnaround plan was implemented and assessed.*

## 10.2. ANALYSIS OF FINANCIALS FOR L & N WORKSHOP – ADDENDUM TO BOARD PAPER 2012/3

This paper sought approval for a 6-month moratorium to L & N Workshop on its lease payments until after the completion of its new plant, to allow the company to successfully relocate and start-up operations at the new plant without incurring rental arrears during the implementation period due to expected disruptions and possible downtime.

*The Board declined the request on the basis that the company showed financial stability with projects in the pipeline, margins of growth, expanded revenue earning capacity and cost control; and should therefore be in a position to continue to pay the rent.*

Director, Finance – Mr. Stuart and Director (Ag.), Export Development and Promotion – Mrs. Lewis exited the meeting at this point.

Board Director, Mrs. Nicholls left the meeting at this point.

## 10.3. AID TO ARTISANS MARKET READINESS PROGRAMME – BP 2015/60

This paper was resubmitted to the Board, as requested, with a revised list of potential artisans to participate.

*Recommendations for the selected two, however, were not made and the Board requested that the matter be returned to management for a selection of artisans to participate.*

## 10.4. TENANCY REQUEST BY ALL HEALTH INC.

Board Director, Mr. Gibson recused himself from the discussion at the point.

Board Director, Mr. Padmore arrived at this point.

*In revisiting this matter, the Board noted that the Board Paper in relation to this tenancy request did not contain the rental rate for the space, and confirmed the*

4

DOJ-CDL-000513784

*approval of the space allocation for the occupancy of Suite 104A, Building #2, Harbour Estate at the normal rental rates.*

Board Directors, Mr. Gibson and Mrs. Nicholls returned to the meeting at this point.

### 10.5. CORRESPONDENCE

#### i. Letter from Attorney, Re: Retiring Employees

The Legal Officer/Board Secretary informed the Board that the Corporation received a letter from Attorneys-at-Law, Gregory Nicholls & Associates on Thursday, June 18, 2015 regarding the employees to be retired. The pre-action protocol letter stated that it was acting on behalf of eleven (11) employees, and outlined the intention of the attorney in representing the employees.

It was noted that at least three (3) employees expressed that they were not part of the process, as they had not engaged the attorney. One of the listed persons, Ms. Joan Elcock, was not included in employees to be retired.

### 10.6. OTHER MATTERS

#### ii. Staff Meeting To Discuss Matter of Retired Employees

The Chief Executive Officer informed the Board that a Staff Meeting was held on Friday, June 19, 2015 to bring the matter to staff's attention. There appeared to be some settling down of staff after the meeting. Protocol regarding access to the building for retired employees was instituted with access restricted only to normal working hours.

### 10.7. LEASES/DOCUMENTS FOR SIGNATURE

Two (2) leases were presented for signature:

- GP Avis Agencies Inc.
- Cake and Pasty Factory.

There being no further business, the meeting was adjourned at 5:48 p.m.

Confirmed the ..15..... day of ...September...., 2015

.............................................................
Chairman

5

DOJ-CDL-000513785

DOJ-CDL-000513786