1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        18-CR-134(KAM)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5            -versus-                   April 27, 2021
                                        3:00 p.m.
6    DONVILLE INNISS,

7            Defendant.

8    ------------------------------x

9            TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
               BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES

12   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
13                            271 Cadman Plaza East
                              Brooklyn, New York 11201
14                            BY:  GERALD MOODY, ESQ.
                                   DAVID GOPSTEIN, ESQ.
15                                 SYLVIA SHWEDER, ESQ.
                              Assistant United States Attorneys
16
     For the Defendant:       GRAY ROBINSON
17                            333 SE Second Avenue
                              Miami, Florida 33131
18                            BY:  JOEL HIRSHHORN, ESQ.

19
     Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
20                            Phone:  718-613-2268
                              Email:  RivkaTeich@gmail.com
21
     Proceedings recorded by mechanical stenography.  Transcript
22   produced by computer-aided transcription.

23

24

25

1          (In open court.)

2          THE DEPUTY CLERK:  This is criminal cause for

3   sentencing, U.S. v. Donville Inniss.

4          Will the Government's attorney state your

5   appearance?

6          MR. MOODY:  Good afternoon, your Honor, Gerald

7   Moody, Assistant Chief in the Foreign Corrupt Practices Act of

8   the criminal fraud section.  With me is Assistant United

9   States Attorney David Gopstein and Sylvia Shweder.

10         THE COURT:  Good afternoon.

11         On behalf of Mr. Inniss?

12         MR. HIRSCHHORN:  Joel Hirschhorn.  I've been

13  admitted in this matter by your Honor.

14         THE COURT:  Yes, hello.  Good afternoon, sir.

15         And good afternoon, Mr. Inniss.

16         THE DEFENDANT:  Good afternoon.

17         THE COURT:  Sir, do you have any difficulty speaking

18  and understanding English?

19         THE DEFENDANT:  No, I don't.

20         THE COURT:  Raise your right hand and take an oath

21  to tell the truth.

22         (Defendant sworn.)

23         THE DEFENDANT:  Yes.

24         THE COURT:  Mr. Inniss, as you can see we have a

25  court reporter here who is making a transcript of today's

1  proceedings.  That transcript will be made part of the

2  official court record, if you choose to exercise your

3  appellate rights.

4          I'd like to first ask the Government whether they

5  have given victim notification of today's sentencing

6  proceeding?

7          MR. MOODY:  Your Honor, we do not believe there is

8  an identifiable victim in this case.

9          THE COURT:  All right.  I noted that the PSR

10 indicated that restitution was mandatory.  Obviously the

11 insurance company is out money; but you do not consider them

12 to be a victim; is that correct?

13         MR. MOODY:  That's correct, your Honor.  The

14 insurance company is held responsible for the actions of its

15 senior management.  They are not a victim here.

16         THE COURT:  Thank you, sir.  In preparation for

17 Mr. Inniss' sentencing I've reviewed the second Superseding

18 Indictment dated August 1st, 2019; the jury verdict sheet

19 finding Mr. Inniss guilty on all three counts, that verdict

20 sheet was dated January 16, 2020.

21         I've also reviewed the order for forfeiture, which I

22 previously executed on August 20, 2020.  That forfeiture order

23 will be made part of the judgment here today.

24         I've reviewed the Probation Department's presentence

25 report and the Probation Department's sentencing

1   recommendation dated October 30, 2020.  And the Probation

2   Department's addendum to the PSR dated April 2, 2021.

3           I've also reviewed defense counsel's sentencing

4   submission dated March 30, 2021.  And the April 14 sentencing

5   supplement.  As well as multiple letters from various family

6   members and other supporters submitted on April 9, 2021.

7           Finally, I've reviewed the Government's sentencing

8   submission dated April 9, 2021.

9           Have I over looked any submissions, counsel?

10          MR. MOODY:  No, your Honor.

11          MR. HIRSCHHORN:  No, your Honor.

12          THE COURT:  Thank you.

13          Mr. Inniss is a citizen of Barbados not a U.S.

14  citizen.  Accordingly, he does have the right to have members

15  of his consulate present and to have them assist him during

16  this proceeding.

17          Do you wish to exercise that right, Mr. Inniss?

18          THE DEFENDANT:  No, I don't.

19          THE COURT:  In addition, Mr. Inniss is a permanent

20  resident of the United States.  Has ICE been given

21  notification of today's sentencing, counsel for the

22  Government?

23          MS. SHWEDER:  I'm not sure, your Honor.  But they

24  are aware that he's not a U.S. citizen and that we have been

25  going through this process.  He's a permanent resident of the

SENTENCING

1    United States, so it's a little bit of a different situation.

2    I'll make sure to confirm that that is followed through with.

3              THE COURT:  Thank you.

4              MR. HIRSCHHORN:  Before you leave that point, I

5    would like to ask Mr. Inniss a quick question.

6              (Brief pause.)

7              MR. HIRSCHHORN:  Mr. Inniss and I previously

8    discussed the fact that regardless of the sentence imposed,

9    whenever he is no longer in the constructive custody of the

10   Attorney General, he will agree to voluntarily return to

11   Barbados.

12             THE COURT:  All right.  I was next going to address

13   my understanding that there is not an ICE detainer; is that

14   correct, Ms. Shweder?

15             MS. SHWEDER:  That's correct, your Honor.

16             THE COURT:  Thank you.

17             Mr. Inniss, are you satisfied with your attorney,

18   Mr. Joel Hirschhorn?

19             THE DEFENDANT:  Yes, I am, your Honor.

20             THE COURT:  Mr. Hirschhorn, are there any unresolved

21   conflicts or contentions or issues between you and your

22   client?

23             MR. HIRSCHHORN:  No, your Honor.

24             THE COURT:  I appreciate the show of respect when

25   you stand, but if it's more comfortable the microphones on the

1  table will pick up your voices and you need not stand when you

2  address me.  But thank you for that.

3          MR. HIRSCHHORN:  Thank you, your Honor.

4          THE COURT:  Yes, please, be comfortable.

5          Mr. Inniss does appear to be fully alert and

6  following the proceedings closely.  Would you agree with that

7  observation, Mr. Hirschhorn?

8          MR. HIRSCHHORN:  Yes.

9          THE COURT:  Do you know any of any reason not to

10  proceed today with Mr. Inniss' sentencing?

11          MR. HIRSCHHORN:  There is no legal cause.

12          THE COURT:  Mr. Inniss, have you been able to review

13  the presentence report and the addenda, the Government's

14  sentencing submissions, as well as the submissions by your

15  attorney relating to your sentencing?

16          THE DEFENDANT:  Yes, I have, your Honor.

17          THE COURT:  Did you have any difficulty

18  understanding those submissions?

19          THE DEFENDANT:  No, your Honor.  They were clarified

20  by my attorney.

21          THE COURT:  So did have you a full opportunity to

22  discuss those submissions with your lawyer?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Are you ready now to be sentenced, sir?

25          THE DEFENDANT:  Yes, your Honor.

SENTENCING

1    THE COURT:  Mr. Inniss, you also have what is called

2    the right to a Fatico fact-finding hearing.  That's a hearing

3    during which parties may present evidence relevant to

4    sentencing, particularly if there are disputed issues of fact.

5    Do you wish to schedule such a hearing?

6    THE DEFENDANT:  No, your Honor.

7    THE COURT:  Mr. Inniss, you do have the right to

8    make a statement here in open court if you would like to be

9    heard.  I'm happy to hear from you, sir.  Do you wish to be

10   heard?

11   THE DEFENDANT:  Yes, your Honor.

12   THE COURT:  All right.  Please speak slowly and the

13   green disk on the table is the microphone, so please take your

14   time.  I'll hear from you.

15   THE DEFENDANT:  Your Honor, on May 24, 2018, I saw

16   the end of my ten years as a member of Parliament of Barbados

17   and as a Cabinet Minister.  Not only did I lose my seat as the

18   MP, for the constituency of James South, but my term team of

19   fellow candidates in my party failed to win any seats in the

20   thirty-member Parliament in Barbados.

21   Democracy has spoken.  And in usual Barbadian style,

22   we were all gracious in accepting our defeat in wishing the

23   new Prime Minsters group best wishes.

24   It was a time of deep reflection as to where you

25   went wrong as a politician, and where your team also made

1    errors.  It was also a time for quite solitude as you now seek

2    to make up lost family time; and given my age then of 52

3    years, a time to strategize as to the future.

4         My passion for public service spanned over 30 years

5    of academic studies, practical work experience, and voluntary

6    community service.  I feel that my ten years as a practicing

7    politician had created in me an undying passion for public

8    service.  I felt then that this defeat was just another lesson

9    in life and reflection of the will of the people at the time.

10   I never got angry.  I never felt bitter.

11        Now, as a boy growing up in a working-class family

12   in rural working-class Barbados, my parents, neighbors and

13   family all instilled in us a strong value system based on

14   striving to always do our best, helping those in need, valuing

15   education, having a strong religious foundation, and never

16   forgetting from where you have come.

17        Upon reflection, the all African proverb of, "It

18   takes a village to raise a child," was most apt in my brain

19   and helped to form my character.  We learned to joy and

20   maximize whatever we were given in life.  We were taught to

21   respect the property of others and to work hard for whatever

22   we wanted to achieve.

23        So I stand -- or rather sit -- here today, your

24   Honor, before you, eternally grateful that my island my family

25   and friends have provided to me.

1       It was with a deep sense of loss and national

2  election, buttressed with my experience and strength of

3  character and in view of the desire to continue with life's

4  journey, that I left Barbados for Tampa, Florida in early

5  August 2018.  My plans were to begin to reacquaint myself with

6  a city and a country that I had also been in for many years; a

7  place that I my wife and sons are citizens of.  As a matter of

8  fact, my children were born but the few miles here in

9  University Hospital Mineola, Nassau County Long Island, when I

10  lived there back in the 90s.

11      My immediate plans were to ensure that all systems

12  are in place for our youngest son to commence college in

13  August 2018.  For me, to recommence my work in the field of

14  international business while also striving to complete my

15  doctorate in business administration.  I had started my

16  doctoral program while serving as an MP and as a cabinet

17  minister, not just to gather further knowledge in my field of

18  international business but also to inspire my children and

19  others that the sky is the limit and one can achieve success

20  in life if you apply yourself.

21      My dream was that by 2019/2020, I would have

22  completed my doctorate.  I would have been serving perhaps a

23  college lecturer in my chosen field, helping to shape the

24  minds of youth and helping to create sustainable businesses.

25  My eyes would have remained focused on also returning to

1    active politics in Barbados within a few years.

2         However, all such hopes, dreams and aspirations seem

3    to fade into oblivion on that fateful day when I was arrested

4    upon arrival at Tampa International Airport, and charged with

5    the crimes as contained in the Indictment.

6         Initially, your Honor, it felt surreal.  It took a

7    few days for the reality and the seriousness of the gravity of

8    the situation to take root.  Having reached middle age and

9    never been accused of corruption, or knowingly engaged in any

10    corrupt practices, this arrest and Indictment hit me like a

11    ton of bricks.  Obviously, I became immediately concerned as

12    to the well-being of my wife, my sons, my family, my island,

13    and even my former constituents who I represented in

14    Parliament.

15         I felt alone then as stranded in a country that I

16    had been in and out of for nearly 30 years, but had not yet

17    gotten the chance to call home.  I was in a country where I

18    had few friends, less family, little resources, and really no

19    support system.  Actually, your Honor, back then I only knew

20    of one attorney in this country and I never had a need for use

21    of a lawyer in the U.S. of A. before.

22         Your Honor, I have spent the last 32 months

23    restricted to Florida, except for court appearances here in

24    New York.  I have faced the immense embarrassment of these

25    serious charges Indictment, pretrial, trial, conviction.  And

SENTENCING

1  now I stand before you as my fate and my future is

2  determined -- or I sit before you, your Honor, as my future

3  and fate is determined.

4        For many this trial has been not just about the

5  charities, the allegations, the findings, and other legal

6  issues, it has equally been for some about emotions, realities

7  of life, and an uncertain future.

8        It would be remiss of me as I sit here today, your

9  Honor, and throw myself at your mercy if I did not express my

10  sincere apologies to those who have been most affected by this

11  case, besides myself.  For the media, and those prone to

12  sensualism, this matter may have just been about coverage of a

13  case in the U.S, where for the first time a Barbadian

14  politician has been charged and found guilty, primarily based

15  on crimes committed inform Barbados before first being charged

16  in Barbados.  But for my family, myself and my island of

17  birth, this is the situation that I would not have wished on

18  my worse enemy.

19        My wife and sons have been my bedrock over the

20  years.  They know better than anyone else the sacrifices that

21  have been made as I pursued dreams of being a representative

22  of the people.  They know the impact upon the family.  They've

23  always been incredibly supportive and have never complained.

24        As a father, I made the commitment to spend quality

25  time with my sons.  I was there at University Hospital in New

1  York, as I said, when they were born.  As a father I developed

2  a strong bond with my sons.

3        Your Honor, I always said, healthy family relations

4  are not defined by the size or location of your house, by the

5  car you drive, or the number of zeros in your bank account;

6  but more importantly, by the simple things such as giving them

7  a bath, reading with them, taking them to school, doctor

8  visits, deciding on school programs, engaging in extra

9  curricular activities; and as a father of two boys, even that

10  dreaded conversation about relationships.

11        Whilst I had a busy four schedule in public life, I

12  was there for and with my sons and my wife and family.  Your

13  Honor, I've had the honor of visiting some approximately 39

14  countries over the years as I pursued either personal business

15  interests, or executed the work on behalf of my island

16  Barbados.  But even if I had to take a two-minute break from a

17  high-powered meeting, I did so to say good morning or good

18  evening to my family, especially my sons.  It made a

19  difference to all of us.

20        One can only imagine the embarrassment, pain, anger

21  and other mixed emotions that my wife and sons have had to

22  endure over the past 32 months.  Just when we thought that it

23  was a time to work on solidifying our future, it all came

24  crashing down.  I am eternally grateful for their love and

25  support.  And trust that you will find it fit to allow me to

1    continue with them as we try to pick up the pieces.

2             Likewise, for my sisters and brothers who have

3    sacrificed a lot to visit with me in the U.S. of A., calling

4    and offering their love, support and praise, I feel their

5    pain.  It is very real and it is very immense.

6             Your Honor, it is also a times like theses that you

7    realize who your true friends are.  The constraints of being

8    in a foreign country certainly have influenced the ability to

9    reach out and to help.  The fear of even applying to the U.S.

10   Embassy for a visa is real.  I wish to publicly empathize with

11   them; but more importantly, to apologize to them for the pain

12   and anguish that that my charges, trial and conviction her in

13   the U.S. has had on them as well.

14            In as much as I owe an immense debt of gratitude to

15   Barbados for raising me, nurturing and providing

16   opportunities; I equally owe Barbados a deep and sincere

17   apology for the pain, suffering and embarrassment caused

18   because of my legal battles here in the U.S. of A.

19            Your Honor, it is very difficult to explain the

20   passion and love one can feel for their country of birth.  The

21   shame caused by my legal battles here can cut like a knife on

22   the political and social fabric of Barbados.  This fact has

23   never been lost on me.

24            I have served in the most important bodies in

25   Barbados.  And I have much more than a fleeting glance at how

1   cases like mine impact upon the island.  It is important that

2   citizens have faith in the institutions, systems, and indeed,

3   their politicians.

4           Your Honor, I've served as a Parliamentarian for ten

5   years, and hence, will be party to intense discussions on

6   policies, programs and laws that provided for the orderly and

7   good governance in of the island of Barbados.  Service such

8   discussions centered on governance, corruption and society.

9           Back in 2010 the then-Government of which I was a

10  part of it, recognized that the 1929 Prevention of Corruption

11  Act was outdated and in need of better changes to bring the

12  law into some semblance of relationships with modern

13  Government, people and politics.  It was noted that then, in

14  its 80 years of existence, no one had ever been charged under

15  that law.  Furthermore, it predated the establishment of

16  cabinet Government, the 1966 Constitution of Barbados, and

17  several other laws, structures, policies and programs.  To

18  date, and after several attempts to completely overhall that

19  legislation, it remains on the statute of Barbados.

20          Your Honor, the fact that I am the first person

21  convicted by the use of the 1929 Barbados Prevention of

22  Corruption Act is not lost on me.

23          The fact that the Court here and all interested

24  parties may not have been benefited from a fuller discussion

25  on that particular legislation and its application or lack

1    thereof over the past 90 years, is also not lost on me.  The

2    fact that it has occurred in the U.S. of A. is also profound.

3         One can only imagine the pain, distractions, hurt

4    and embarrassment that my conviction here has caused to the

5    Government and people of Barbados.  For that, I must deeply

6    apologize.

7         So your Honor knows, perhaps it's not the time to

8    detail my views on aspects of my charges and trial.  We are

9    the sentencing point.

10         I thank you for your professionalism and as you took

11    charge of this trial.  I cannot speak to specific legal

12    issues, but certainly to a willingness to hear our side.

13         As we proceed on this journey, let me also say

14    upfront that I bear no malice against the jury or the

15    prosecutors in my case.  But as we proceed along this journey,

16    I have faith that my current legal counsel will address any

17    perceived or real errors in a professional and courteous

18    matter.

19         Your Honor, I stand before you today as a man who

20    offered to serve the land of my birth without fear or favor.

21    The sacrifices I made in so doing, pale in comparison to the

22    satisfaction I got from being of service.  No phone call in

23    the dead of the night from a constituent to let me know that

24    someone in the household had just died or was severely ill

25    caused me any discomfort.  No invitations to wedding,

1   anniversary, christenings, sporting events, graduations,

2   parties, counseling, weddings, funerals or concerts or any

3   other events were too small or too unimportant for me to

4   attend and give my support.

5        Here in the U.S. of A elected representatives are

6   separate and distinct from cabinet members.  In Barbados, they

7   can often be one and the same.

8        Likewise, unlike the U.S.A. where a politician will

9   have a support staff; in Barbados, one will be called upon to

10   perform even the most minute duty.  It was not unusual for me

11   to get on the end to help a constituent resolve an issue.  I

12   never complained.  It was what was part of my culture, my

13   upbringing, and indeed, my passion.

14        There were cases for whom a little extra lesson

15   after school or internet access at home made a difference

16   between success or failure in life.  I was happy to oblige.

17        So perhaps, your Honor, would appreciate the pain

18   that both I and others feel as I sit here before you today and

19   seek your mercy.  Your Honor, there are no specific laws

20   regarding the financing of political campaigns in Barbados.

21   As such, politicians invariably engage with and have the

22   activities financed and supported by private persons or

23   corporate entities.

24        So what I may have thought was a huge political

25   support, has emerged here as much more than that.  The lessons

1  learned here must not be lost on present and future

2  politicians and our systems in Barbados and elsewhere.  I

3  trust that the authorities there will frankly address any

4  locuna, so that no politician back home would ever have to

5  face or endure what I have here in the U.S. of A. for the last

6  32 months.

7         For several months I sat and asked myself if I fully

8  understood and appreciated the legal, moral and ethical

9  responsibilities of a cabinet member in Barbados.  I asked

10  myself if and how I can knowingly participate in an act or

11  acts of corruption.  I asked myself how, when and where did I

12  create fictitious invoices.  But, alas, this query was

13  answered in the Court -- admitting to doing as such; of course

14  being granted a non-prosecutorial agreement by the U.S.

15  authorities.

16         It is truly regrettable that I was not privy to the

17  internal communication of staff at the Insurance Corporation

18  Barbados regarding these allegations, decisions, and related

19  matters.  I certainly did not advise any ICBL officers on the

20  BIDC contracts.  Certainly, no one ever asked me if any

21  contracts were approved.  As former counselor for advice out

22  of back then.  Not with standing the fact, your Honor, that

23  this case was in great measure initiated by insurance Corp.

24  limited.  As their citizen as a former member of Parliament of

25  some staff of that companied and acquaintance of former

SENTENCING

1    present staff I too wish to apologize for my anguish that my

2    trial and conviction in the U.S. of A have caused to said

3    individuals.  The fact that the Insurance Corporation of

4    Barbados Limited continues to be the principal insurer of most

5    Government-related entities in Barbados is instructive.  But

6    your Honor, the Court has weighed in on this and other matters

7    and a jury has pronounced on such.  As much as I've been

8    pained over the such, I accept as it is to date.

9            Your Honor, I have been charged, tried and convicted

10   for allegedly using my influence as a cabinet minister to

11   determination the issuance of an insurance contract on behalf

12   of the Barbados Investment and Development Corporation, BIDC.

13           What was not revealed through this trial, is the

14   fact that I spent seven years as a business development

15   officer at that said institution.  As a young officer, I

16   worked for that agency in Barbados, self-career, and here in

17   New York City.  As such, even though I ceased employment there

18   some quite a few years ago, I still had several former

19   colleagues and friends who remain there.  I too wish to

20   apologize to them for any pain and hurt that they have

21   suffered as on an individual level and as their corporation

22   due to this trial here in the U.S. of A. and my role then.

23           During my tenure, the Barbados Investment ment

24   Development Corporation was led by a Board of Directors and

25   management team who, to the best of my knowledge, conducted

1    themselves in a very professional manner.  I thank them for

2    their service.  I know the way they conducted their meetings

3    and affairs and documented such.  I note in keeping with law

4    governing the establishment of functioning, the Minister was

5    restricted from exercising any undue influence on their

6    affairs.

7           Your Honor, I searched high and low for documents,

8    statements, and any other sources of evidence that I, as a

9    Minister, directed the affairs of the BIDC.  In the context of

10   Barbados' laws and practices, Ministers just do not have such

11   powers.

12          I eagerly looked forward to the full discussion on

13   the BIDC acts, its rules, Minister meetings, and statements

14   from officials.  But alas, that did not fully happen.

15          But, your Honor, it is expo facto.  But I wish that

16   pain caused to the BIDC because of this, could have been eased

17   by more public exposure of their deliberations around this

18   matter.

19          Today I continue to humble myself before you in the

20   Court.  Humility has always been my hallmark for constructive

21   engagement with peers and others.  And I am very mindful that

22   my future, in great measure, resides with your Honor here

23   today.

24          My family, friends and I have suffered tremendously

25   over the past 32 months.  I have lost nearly all that I worked

1    for to date.  Relationships have been strained irreparably;

2    hopes and dreams of completing studies; engaging in

3    constructive employment have all been dashed aside.  Financial

4    ruin has taken root.  My health has even sunk to a level that

5    threatens my existence.  And there is this continuous sense of

6    hopelessness and despair.

7         Others may speak of this trial and conviction in

8    great abstract terms.  To me, it is real and painful.  Had I

9    thought that for one moment that any actions that I

10   contemplated, facilitated or otherwise engaged in were

11   designed to be corrupt, I would have thought not once, twice

12   or three times; I would simply have done such.

13        Your Honor, I've lost my dignity, respect,

14   relationships, and hope over the past 32 months while being

15   confined here.  But those may just be general terms.

16        I've often very reluctant to tell others exactly

17   what I've experienced, how I suffered over the past 32 months.

18   I've done so out of an unwillingness to burden others or to

19   have them neglect their own circumstance to address my

20   concerns.  But there are some very real and practical

21   challenges that I've had to face and live with since

22   August 2018.

23        Even before my first pretrial hearing, I got notice

24   my bankers are closing my accounts, and wanting absolutely

25   nothing to do with me as a customer.  For those in the U.S. of

1    A., that is a tough one to deal with.  But as a customer in

2    Barbados, currently maintaining U.S.A., is even worse.  No

3    amount of pleading my innocence and asking for this matter to

4    be resolved here first, appealed to the ears of some bankers.

5         Your Honor, with my limited financial resources

6    located in Barbados, and I in the U.S.A., it was very

7    difficult.  To be able to engage in bankers from abroad was

8    even more difficult.  Out of that, your Honor, the fact that

9    the Barbados currency is not accepted beyond it's

10   international airport.  And that we should not send U.S.

11   dollars out of Barbados without the Central Bank of Barbados'

12   permission.  So, your Honor, effectively since August 2018,

13   I've been compelled to be at the mercy of cash to survive.

14   Money to pay for housing, health, food, transportation, basic

15   survival has been done by asking for loans in cash.  I would

16   have preferred not to have done so, but I had little choice.

17        And so every attempt to find employment here in the

18   U.S. of A. have also been unsuccessful to date.  For once

19   potential employers are made aware of the charges, the doors

20   were suddenly closed in your face.  Once convicted 16 months

21   ago, all doors really were closed.  Even those willing to

22   engage, the prospects of having to leave at short notice to

23   attend court created a block.

24        But I sought to persevere, your Honor.  And I have

25   faith that there is light at the end of the tunnel.

1        I will confess that I've given advice to businesses

2   in the U.S. and elsewhere since I've been here in the U.S. of

3   A. for the last 32 months.  They have all said that they

4   respect my experience and value my input; unfortunately, they

5   have not seen it fit to pay me.  But perhaps some day they

6   will, your Honor.

7        So I truly know what is like to be a convict,

8   immigrant, black, and poor in the United States of America.  I

9   felt it all wrapped in one.

10       Simple things that may appear to others, your Honor,

11  I've had difficulty with.  For example, the fact that I came

12  from the island of Barbados where access to affordable

13  healthcare is free to citizens of Barbados.  The first shocker

14  for me here in the United States of America in these

15  circumstances was recognizing that given preexisting

16  conditions, my race, and other adverse circumstances health

17  insurance was needed.  I almost pivoted on the brim when first

18  quote I got for health insurance in the state of Florida was

19  some $1,600 per month.  I certainly could not afford that.

20       However, overtime I've been able to find a more

21  manageable policy for example.  I have to live with my health

22  situation and prospects having to go through COVID-19, as

23  millions of other Americans as well.  So it has been very,

24  very difficult over the last 32 months.

25       The other challenge, your Honor, is that while I

1    look forward to returning to Barbados, I do so being aware of

2    the fact that I would be persona non grata in many respects.

3    The ability to do simple things, open a bank account, update

4    services, find employment, and have relationships are minimal.

5    It's like having gone to the mountain top and catapulted down

6    the sides, with all the cuts, bruises, agony being cascade

7    down the side.  Recovery is uncertain, but one willing to

8    fight for.

9          So, your Honor, I can only pray that you will find

10   it prudent that I be allowed to gather every sinew in my body

11   to attempt to be a positive contributor to society and my

12   kind, in whatever time the Creator has determined I have left.

13         For some, this may just be another trial and

14   sentencing of a politician from a third-world developing

15   nation here in the United States of America.  To me, it is a

16   serious reflection of not just where I may have missed many

17   errors -- or some errors -- in life and public service, but of

18   equal importance, how can my experience be used to better our

19   system of politics, leadership and governance.

20         My attorneys today will address the legal issues of

21   sentencing before your Honor.  I will continue to attend to

22   any and all matters arising thereof.

23         So once again, in close, I thank you for your

24   patience.  I thank you for your leadership over this trial.

25   And I once again sincerely apologize for any and all other

1    errors that I may have made.  I stand with respect, of course,

2    to the prosecutors and all court officers involved in this

3    matter.  And I humbly throw myself at your mercy as end

4    sentencing here today. Thank you.

5              THE COURT:  Thank you, Mr. Inniss.

6              Would counsel like to be heard?

7              MR. HIRSCHHORN:  Yes, your Honor.  I thought we

8    might at least briefly address the objections to the

9    presentence report so that they are preserved.  I believe I

10   have to do that.

11             THE COURT:  Well, I know they are in your sentencing

12   submissions.  You have two objections which I'm prepared to --

13   I can hear further argument, if you would like.

14             MR. HIRSCHHORN:  Very briefly.

15             THE COURT:  I read all the submissions.  I'm

16   prepared to rule on those objections.

17             MR. HIRSCHHORN:  If I might just very briefly.

18             THE COURT:  Of course.

19             MR. HIRSCHHORN:  I'm not going to address -- the

20   only objections to address is the ones that affect the

21   sentencing guidelines.  If I might briefly, Judge?

22             THE COURT:  Sure.

23             MR. HIRSCHHORN:  With respect to paragraphs 18 and

24   21, this in a sense is the basis of our defense and was

25   addressed by the Court in its order denying the motion for

1   judgment of acquittal or for a new trial.  So I just simply

2   renew it so it is preserved.

3           With respect to paragraph 23 and paragraph 30, we

4   contend, and have made it clear, that we believe that these

5   two payments were in fact related and should be addressed as

6   one payment, contrary to U.S.S.G. Section 2C1.1(b)(1).  And

7   therefore, for guideline purposes our guideline should be

8   reduced by two points.

9           With respect to paragraph 32, we suggest that the

10  sophisticated means enhancement, which consisted essentially

11  of false invoices, a wire into the dental laboratory, and then

12  distribution of funds to or for or at Mr. Inniss' direction,

13  is not sophisticated within the sense of the word I am used to

14  and I think the courts have addressed ever since the federal

15  guidelines have gone into effect.  So, therefore, we suggest

16  that the guidelines ought to be reduced by two points.

17          Thus, while the Probation Officer and the Government

18  offer an offense level of 28, we believe the offense level in

19  the presentence report ought to be 24.

20          That's without addressing the departures or

21  variances, such as the guidelines as applied seriously

22  overstate, or overstate the seriousness of the specific

23  conduct.

24          So that's the renewal of our objections to the

25  presentence report argument.

SENTENCING

1    THE COURT:  Thank you.  Was there anything else that

2    you wanted to address, sir?

3    MR. HIRSCHHORN:  Other than allocution, Judge,

4    that's the only objection I wanted to address.  I am prepared

5    to proceed with allocution.

6    THE COURT:  Sure.  I'm happy to hear from you right

7    now.

8    MR. HIRSCHHORN:  Your Honor, we have here two

9    witnesses who have asked to be heard.  In reality -- they are

10   out in the gallery there -- we've already submitted eight

11   letters.  I know you've read them.  The defendant's wife is

12   here, as are one of his brothers, and his sister-in-law.  But

13   we would call at this time, if the Court would permit, first

14   the Reverand Hewitt to address the Court briefly.

15   THE COURT:  Did he not submit a letter?

16   MR. HIRSCHHORN:  He did submit a letter.

17   THE COURT:  Is there something that I need to -- is

18   there something more that he needs to say?

19   MR. HIRSCHHORN:  I think he felt the letter didn't

20   communicate as well as a brief three- or four-minute address

21   to the Court.  He flew up from Barbados I believe -- sorry,

22   from Florida, for that.

23   THE COURT:  I will hear from him.  I would suggest

24   is if you can address the Court from where you are just so we

25   can maintain distance; or perhaps, Ms. Jackson, you can turn

1    on the podium.

2          MR. HIRSCHHORN:  I think the podium is on, Judge.

3          And state your name for the record please once you

4    arrive at the podium.

5          MR. HEWITT:  My name is Guy Hewitt, G-U-Y,

6    H-E-W-I-T-T.

7          THE COURT:  Thank you, sir.  I'll be happy to hear

8    from you.

9          MR. HEWITT:  Your Honor, I am hear to provide a

10   character reference on behalf of Donville Inniss in my

11   capacity as a friend for over 40 years, former colleague, and

12   as an ordained minister.  I've known Donville for most of my

13   life.  From secondary school, which is the equivalent of

14   middle and high school in Barbados, from university and

15   working together professionally.  We collaborated in my prior

16   role as the Chair of the Board of Management of the Queen

17   Elizabeth Hospital, which is Barbados' sole tertiary

18   institution.  And joined his tenure as Minister of Health,

19   which is equivalent to Secretary here.  And then, again, when

20   I was Ambassador for Barbados to the United Kingdom when he

21   was Minister of International Business.

22          We attended Harrison College, which is Barbados'

23   oldest and premiere high school, in pursuit of excellence

24   under the motto In Deo Fides.  The curriculum fostered

25   self-confidence, enthusiasm, leadership, team work,

1   perseverance and integrity.  Our alma mater produced the

2   succession of outstanding politicians, jurists, doctors,

3   entrepreneurs, and leaders across all spheres of endeavor.

4          While we were at university we not only acquired

5   high level skills for professional success, but also a

6   consciousness to contribute to the growth and development of

7   Barbados and the wider Caribbean.  This, your Honor, is the

8   stuff that we are made of.

9          It is important for me to state that I never had

10  cause to suspect that Donville ever suffered from the cancer

11  of political corruption that has destroyed many developing

12  countries and eats away globally at citizens' faith in the

13  democracy.

14         On a personal note, our families are close.  We are

15  well acquainted with each other's wives and children.  I am

16  aware of the immeasurable impact that this matter is having on

17  Donville's wife, Gail, and his son's Kyle and Kofi.

18         I am aware that Donville has asserted his integrity

19  throughout this matter, and plans to work hard to exonerate

20  himself and his reputation.

21         And, your Honor, I come here to stand before you in

22  solidarity with him.  So I thank you and the Court for this

23  opportunity.

24         THE COURT:  Thank you, sir.

25         MR. HIRSCHHORN:  The other witness is Adriel

 1  Brathwaite, who did come in from Barbados.  Although he did

 2  submit a letter, I believe he wants to amplify briefly on some

 3  of his points.

 4          THE COURT:  All right, sir.

 5          MR. BRATHWAITE:  My name is Adriel, A-D-R-I-E-L,

 6  Brathwaite, B-R-A-T-H-W-A-I-T-E.

 7          MR. HIRSCHHORN:  Before you start, let me ask you a

 8  few questions.  Were you formerly the Attorney General of the

 9  Barbados?

10          MR. BRATHWAITE:  Yes, I was.  I served as Attorney

11  General from October 2010 until May 2018.

12          MR. HIRSCHHORN:  Are you a QC or Queens Counsel?

13          MR. BRATHWAITE:  I am.  I've been a practicing law

14  in Barbados for 33 years.

15          MR. HIRSCHHORN:  Could you pull that microphone

16  closer to you?  Thank you.

17          THE COURT:  All right, sir, I'll hear from you.

18          MR. BRATHWAITE:  Your Honor, thank you for this

19  brief opportunity to present to you this afternoon on behalf

20  of Donville Inniss.  I have made a written submission.  I know

21  that written submission would have told you of my relationship

22  with Donville and my experience as Attorney General of

23  Barbados.  What it would not have disclosed is that I was also

24  Minister responsible for Home Affairs and, therefore,

25  responsible for the prison system in Barbados.

1       As such, your Honor, I'm very aware and have

2  embraced the concept of second chances.  Indeed, your Honor,

3  I'm aware, I know several individuals, who when offered second

4  chances by the courts Barbados have never come into contact

5  again with the criminal justice system and are making

6  reasonable contributions to the development of our country.

7       I believe, ma'am, that the strength of character,

8  the virtues that Donville Inniss has, his commitment to

9  community service, to the enhancement of his fellow man, his

10  integrity, his character, makes him, in my eyes, a very

11  suitable candidate to be given a second chance, your Honor.  A

12  very suitable candidate not to be given a custodial sentence,

13  but to be allowed to be reunited with his family.

14       Your Honor, over the last 32 months -- I've known

15  Donville for 44 years, let me say that -- over the last 32

16  months, I have traveled with him as he has gone through the

17  challenges here in the United States.  I've been working, for

18  example, with him over the last 18 months or so trying to, as

19  you've heard, to establish a banking relationship in Barbados

20  because his banks have said to him that they no longer wish

21  his business.  I've tried the credit unions who have basically

22  said the same things.  So we are faced -- he's faced -- with

23  the situation where almost all of his investments are

24  unattract (ph).

25       Indeed to my certain knowledge, his existence here

1    over the last 32 months have been largely due to his family,

2    the generosity of his family, and friends like myself who were

3    able to assist him, because finding employment has been almost

4    impossible.

5            I say this to your Honor that it has not been an

6    easy 32 months.  And I'm sure that this Court, like Courts in

7    my jurisdiction, will look at the crime that has been

8    committed, the character of the individual, and what has

9    transpired over the last 32 months.  It is my hope, your

10   Honor, that you will come to the conclusion that I have come

11   to, which is that Mr. Inniss has been punished over the last

12   32 months and that indeed, your Honor, a custodial sentence at

13   this juncture -- if I might be allowed to express my opinion,

14   your Honor -- because it is my opinion that if we were in

15   Barbados and for the same circumstances and the fact given his

16   character, that it is most unlikely that he would have been

17   given a custodial sentence.  It is my hope and pray that you

18   take into consideration the fact that the offenses for which

19   he --

20           MR. MOODY:  Your Honor, the Government objects to

21   this.  We had a discussion with defense counsel about this

22   very issue and defense counsel --

23           MR. HIRSCHHORN:  I agree.

24           MR. MOODY:  -- we would not be hearing about

25   Barbadian law and the former Attorney General's personal views

1    how he would or would not prosecute.

2              MR. HIRSCHHORN:  I agree, your Honor.  I had an

3    agreement with the Government.  I agree.

4              THE COURT:  Did you convey that to Mr. Brathwaite?

5              MR. HIRSCHHORN:  I did.

6              THE COURT:  Sir, as you know, I must apply American

7    law.  Mr. Inniss was convicted of offenses against the United

8    States here in the United States.  And it is American law that

9    the controls my decision regarding sentencing.

10             I have great respect for your country.  I don't mean

11   to minimize it at all.  I have great respectful for your

12   public service as Attorney General for Barbados, but I'm

13   confined to American law.  I appreciate that judges in

14   different countries have authority to impose sentences that

15   they believe are just under the circumstances.

16             MR. BRATHWAITE:  Thank you, your Honor.  I will

17   continue accordingly.

18             I'll just adding myself to the words of Mr. Inniss,

19   your Honor, that you exercise your authority with as much

20   mercy as possible.  I'm obliged, your Honor.

21             THE COURT:  Thank you, sir.

22             MR. HIRSCHHORN:  Your Honor, if I might address the

23   balance of my argument, pure argument, now?

24             THE COURT:  Of course.

25             MR. HIRSCHHORN:  I've been practicing criminal

1    defense work for 53 years.  One thing I learned as a private

2    criminal defense lawyer is all federal crimes are serious;

3    some of course, are more so than others.  Which does not -- I

4    do not mean to undermine the seriousness of this offense, but

5    as we laid out in one of our sentencing memoranda, there are

6    far more serious offenses which carry lower offense levels

7    than the way this particular presentence report reads.  I'm

8    not quarreling with the Probation Officer.  I believe that she

9    computed the offense level the way she read them and the

10   application notes.  So while we're asking for the Court to

11   depart downward, from 28 to 24 based on our previously argued

12   legal points, we're asking the Court now to provide relief.

13   And I'm not embarrassed to say that I'm asking the Court to go

14   down to at least an offense level of eight, which would put

15   the defendant in Zone A.

16          THE COURT:  Based on what?

17          MR. HIRSCHHORN:  Pardon me?

18          THE COURT:  Based on what?  As you know, sir, the

19   guidelines are --

20          MR. HIRSCHHORN:  I apologize.

21          THE COURT:  Let me finish.

22          MR. HIRSCHHORN:  I'm sorry, Judge, under 3553.  The

23   guidelines are what they are.

24          THE COURT:  And they are advisory.  And I

25   acknowledge that they are not binding on me.  But they are

1    required to be consulted and given due respect.

2            MR. HIRSCHHORN:  We made that point and you know

3    that point better than I do.  You've had more sentences in

4    your career than I have.

5            THE COURT:  I don't know about that, if you've been

6    at it for 53 years.

7            MR. HIRSCHHORN:  Under 3553, I would ask the Court

8    to put us in the category that would make probation with

9    appropriate conditions a reasonable offense, not greater than

10   necessary, and consistent with 18 U.S.C. Section 3553.

11           It is troubling to me the nexus to the United

12   States; yes, the transport to a U.S. bank for conduct in

13   Barbados.  That's for an appellate court.

14           Comparative sentences.  We've addressed the

15   seriousness of the Federal Sentencing Guidelines overstate the

16   seriousness of the conduct as we perceive it.  As we laid out

17   in our reply to the Government's response to the defendant's

18   sentencing memo, the guidelines as calculated, even if by the

19   Probation Department and the Government's position is 78 to 97

20   months, even taking my application and agreeing on the two

21   adjustments that takes us down to 63 months.

22           Typically money laundering sentences in this

23   district, according to the statistics provided in our reply to

24   the Government's sentencing memorandum, the average sentence

25   for defendants was 23 months, with a median sentence being six

SENTENCING

1  months.  Then we offer you several examples from the Eastern

2  District of New York.

3          Defendant $141,300, sentenced 48 months.  Defendant

4  was Jonathan Flom.  Michael Dodd and others conspired to

5  launder $2.2 million of fraudulently obtained proceeds from a

6  securities scheme.  The sentences ranged 33 months, 27 months,

7  24 months.

8          THE COURT:  But you're requesting probation,

9  correct?  You're requesting no time in custody.

10          MR. HIRSCHHORN:  I'm sorry, Judge?

11          THE COURT:  You are requesting probation.  You are

12  requesting no custodial time.

13          MR. HIRSCHHORN:  Correct.

14          THE COURT:  Even in your own cases that you cite,

15  the judge was compelled to impose a custodial sentence on the

16  defendants.

17          MR. HIRSCHHORN:  There is -- none of the cases I

18  cited imposed a custodial sentence.  But each of the cases I

19  cited indicate significantly far more serious conduct ranging

20  from laundering $5 billion of narcotics proceeds, and the

21  sentences range in this district from 21 months to 33 months,

22  one person got time served.

23          I don't need to repeat it, except I think you

24  understand my point.  That this is a conviction involving the

25  sum total of $38,000 in connection with two payments that were

1   made for a premium on an insurance policy or policies.  At the

2   time that IBCL -- up until 2015, IBCL had 100 percent of the

3   premium business that they charged to the Government of

4   Barbados.

5           In 2015, IBCL's share was reduced from 70 to

6   30 percent.  Because for a brief period of time the split was

7   50/30/20 percent among three insurance companies.  The

8   determination was made that the insurance company that was

9   going to provide 20 percent of the insurance was not as sound

10  as the other two.  So in 2015 when the first payment was made,

11  the insurance split was 70 percent to IBCL and 30 percent to

12  another company.

13          In 2016 when the second payment was made, it

14  remained at 70 percent and 30 percent.

15          Since 2017, it has been 55 percent for IBCL, and

16  45 percent for the other insurance company.

17          So the question really is, for us, is recognizing

18  that this is a serious crime.  Cases have made it clear that

19  where the guideline overstates the seriousness of the crime

20  under 3553 all factors considered, the Court can -- and I

21  respectfully suggest in this case should -- grant an

22  appropriate relief so that probation with appropriate

23  conditions, whether it's house arrest, or certainly linked

24  with community service, and any other appropriate conditions

25  the Court deems proper.

1      The defendant's been on ankle bracelet monitoring

2 for 32 months.  He has no passport.  He's not a risk of

3 flight.  He has been in a very real sense, as he told you,

4 locked up in this country.  He has announced on the record

5 through me and will reannounce, that when this matter is over

6 he intends to return to Barbados on a voluntary basis, as

7 opposed to going through the mandatory deportation for

8 conviction of a crime that would ultimately occur through

9 immigration.

10      I'd like to reserve the right, Judge, if I might, to

11 address, depending on what your sentence is, some other

12 matters.  I know the Court is aware of the defendant's health

13 condition.  I don't know if it's in the memo or not, but he

14 has been COVID-19 vaccinated.

15      THE COURT:  That's good to know.

16      MR. HIRSCHHORN:  I didn't want to mislead the Court

17 in any way.  He has been.  But I still think the Bureau of

18 Prisons would be reluctant to add to its straining population

19 any way, I would hope so, but he has been vaccinated.

20      THE COURT:  More than two weeks ago?

21      MR. HIRSCHHORN:  March 10, your Honor.

22      THE COURT:  Thank you.  Are you finished, sir?

23      MR. HIRSCHHORN:  I apologize, your Honor.

24      I just wanted to conclude by saying that I believe

25 the totality of the circumstances together with what we pride

1    in this country as even-handed and fair justice, suggests that

2    probation with appropriate conditions is a fair and just

3    sentence.  Thank you.

4            THE COURT:  Thank you.  Does the Government wish to

5    be heard?

6            MR. MOODY:  Yes, your Honor.

7            Given that your Honor has, I'm sure, thoroughly

8    reviewed our submission with regards to the guidelines, we'll

9    rest on our submission given that you said you were ready to

10   rule.  Unless you would like to ask any questions.

11           THE COURT:  I'm ready to rule on the objections.  If

12   you would like to address the request for basically a

13   probationary sentence, I understand that the Government seeks

14   a guideline sentence in this case.

15           MR. MOODY:  That's correct, your Honor.

16           Briefly, your Honor, I'd like to respond to what I

17   think what defense counsel's argument boils down to, which is

18   that there was no harm here, no one was harmed.

19           I think that it's important to focus first on the

20   fact that the reason this question of harm is before the Court

21   is because the defendant chose to accept tens of thousands of

22   dollars in bribes in U.S. bank accounts for taking actions to

23   help ICBL, the Insurance Corporation of Barbados, when the

24   Government contract.

25           ICBL got what it paid for.  Defense counsel went

SENTENCING

1   through it himself.  In 2014, before the first bribe, ICBL had

2   50 percent of the BIDC contract.  In the next two years, 2015

3   and 2016, it got 70 percent.  The year after the final bribe,

4   it went back to 55 percent.  You can see there that the bribes

5   themselves distorted the market.

6         What I think is more important is that there is a

7   reason why under both Barbadian law and U.S. bribery law the

8   question of harm, whether the Government official did or did

9   not do what they were bribed to do, is not required to prove a

10  conviction.  And that's because taking a bribe is in and of

11  itself harmful.  The act by itself undermines the foundational

12  principles that public officials should act in the interest of

13  the public, and never for their own personal financial gain.

14        The defendant's actions undermined the integrity of

15  the U.S. financial system.  The U.S. Patriot Act made clear

16  that Congress take this is crime seriously.  The U.S.

17  financial system is not to be used in furtherance of what the

18  UN Convention called insidious playing of corruption.

19        We agree with defense counsel, that general

20  deterrence is a very important issue here.  International

21  corruption is rampant.  And the U.S. financial system is an

22  attractive place for corrupt foreign officials, like the

23  defendant, to stash or invest their bribes.  These cases are

24  difficult to detect and prosecute.  The defendant and his

25  co-conspirators in this case made sure of that.

1          The defendant's scheme involved multiple foreign

2   countries, multiple bank accounts, multiple foreign domestic

3   companies, and multiple fake invoices for services that were

4   never provided.  In fact, as we heard at trial, the only

5   reason the defendant got caught is because a lot of things

6   happened in exactly the right way to make that possible.

7          BF&M, ICBL's parent company noticed that the bribe

8   payments looked odd.  John White, the CFO of BF&M, he

9   confronted the ICBL executives and he unearthed the bribery

10  scheme.  BF&M disclosed those to facts to the U.S. Government.

11  Two foreign countries were involved, foreign bank accounts,

12  foreign witnesses, and that's why deterrence is so critical.

13  Because there are so many opportunities for corrupt officials,

14  like the defendant, to get away with laundering bribes in the

15  U.S.  So it's important to hold them accountable when they get

16  caught.

17          I think the harm here goes to more just general

18  deterrence, it goes to the seriousness of the offense.  Quite

19  frankly, the need specifically to deter the defendant from

20  committing future crimes.

21          The defendant took part in a long, complicated

22  scheme to receive two separate bribes and launder them through

23  the U.S. banking system.  It was a deliberate, calculated

24  crime.  It wasn't a one-time slip up.

25          Now, the defendant's submission claims that his

1  global career is over.  But unfortunately, I think it's fair

2  to say that's not always the case, even for following

3  politicians even following a felony conviction.

4       What is more -- this is important I think -- the

5  defendant is creating a narrative that he was a victim of U.S.

6  Government overreach.  He even suggested that one of the

7  Government's witnesses committed a crime in Barbados for doing

8  the very thing he did himself, creating a fake invoice for

9  consultancy payments.  Which is not only hypocritical given

10  that he's maintaining his innocence, but also borders on

11  intimidation.

12       The power dynamic here is very important.  The

13  defendant is a former, high-level Government official in

14  Barbados, very powerful, well-known person.  He's singling out

15  a much less powerful person who testified in his trial,

16  suggesting that person should be investigated, while claiming

17  he's innocent.

18       While the Government completely respects the

19  defendant's right to appeal and maintain his innocence, the

20  defendant's own words to the press show that he hasn't been

21  specifically deterred from committing criminal conduct.

22       So for that reason, your Honor, the Government

23  believes that a guideline sentence is appropriate in this

24  case.

25       MR. HIRSCHHORN:  Excuse me, your Honor, could I

1  briefly?

2           THE COURT:  Yes, you may briefly.

3           MR. HIRSCHHORN:  Maybe it's acoustics, I certainly

4  hope I didn't hear what I think I heard, that the defendant's

5  actions undermined the United States financial system?

6           MR. MOODY:  That's correct.

7           MR. HIRSCHHORN:  $38,000 and this country's

8  financial system is at risk?  Multiple bank accounts that I

9  believe the prosecutor just attributed to this man?  He's got

10  a bank account in Barbados and in the United States.

11          If they have proof of multiple bank accounts, I will

12  withdraw my request for probation.  You can't make a statement

13  like that and throw it in the courtroom without any evidence.

14          THE COURT:  He didn't say that Mr. Inniss had

15  multiple bank accounts.  He said that the crime committed by

16  Mr. Inniss, that is the receipt of the bribe and the attempt

17  to launder money, involved multiple bank accounts.

18          MR. HIRSCHHORN:  Who's bank accounts?

19          THE COURT:  No, sir.  The proof at trial

20  demonstrated that money went from the insurance company

21  via fake invoice for bogus consulting services that were never

22  provided --

23          MR. HIRSCHHORN:  Correct.

24          THE COURT:  -- to the parent company in Bermuda.  So

25  from Barbados to Bermuda, then to an account in Elmont, New

1 York, under the name of a nominal party who was an associate

2 of Mr. Inniss', and then from that account into an account

3 under the control of Mr. Inniss.

4      Two accounts in the United States were implicated in

5 this money laundering scheme.  And whether or not you think

6 that $36,000 undermines the American financial institutions,

7 what American financial institutions don't want is the

8 proceeds of illicit activity running through accounts from

9 other countries or domestically.

10      MR. HIRSCHHORN:  I agree --

11      THE COURT:  The financial institutions cannot be

12 used to launder corrupt proceeds.

13      MR. HIRSCHHORN:  I agree.  We don't want that --

14      THE COURT:  Maybe it's a drop in the bucket in your

15 mind, but if everybody felt that it was appropriate to use

16 American financial institutions to launder their ill-gotten

17 gains, we would have a problem.

18      MR. HIRSCHHORN:  Your Honor, I absolutely agree.

19 But to say we undermined the system, as opposed to abused the

20 system, is entirely two different things.  You're right.  I

21 had treated the transfer to the parent company as one instead

22 of two transfers.  So a total of four -- I guess four is

23 multiple -- the way it comes out, it sounds far worse than the

24 reality.

25      THE COURT:  I understand that.

1       MR. HIRSCHHORN:  I --

2       THE COURT:  I understand that you're making

3  arguments that perhaps are better addressed to Congress.  It's

4  my obligation to follow the law.  The U.S.A. Patriot Act was

5  amended specifically to deter money laundering crimes.

6       MR. HIRSCHHORN:  I understand.

7       THE COURT:  Especially proceeds derived against a

8  foreign nation involving bribery of a public official, that's

9  18 U.S. Code Section 1956(c)(7)(B)(4).  The legislative

10  history of that act makes it clear that Congress considered

11  this offense as specified unlawful activity and to be a

12  serious one to send, quote, "a strong signal that the United

13  States will not tolerate the use of its financial institutions

14  for the purpose of laundering the proceeds of such

15  activities."

16       So whether or not you agree with the U.S.A. Patriot

17  Act and Congress' intent in passing that act, it is the law.

18       MR. HIRSCHHORN:  I don't disagree with the law,

19  Judge.  It's the application for the amount of money involved.

20       THE COURT:  There is no exception for a little bit

21  of bribe money, sir.  Money laundering that is the result of

22  illicit proceeds is a crime.

23       And you can write your Congressman and ask that the

24  law be amended to exclude all bribes under $36,000, if you

25  think that's a travesty.  But that's what Congress legislated

1    that's what our law prohibits.

2              MR. HIRSCHHORN:  I don't disagree with the Court.  I

3    have a problem with the sentencing guidelines and the

4    Government's request predicated on, one, the amount; two, this

5    man who stands before you as a first offender whose life is in

6    total ruin; and that --

7              THE COURT:  Is that because of the Government's

8    prosecution?  Or is it because of your client's free choice to

9    engage in certain activities, which happen to be illegal.

10             MR. HIRSCHHORN:  It's his conduct.  But he still

11   stands before you as a first offender, Judge.

12             THE COURT:  I understand that.  He'll be given

13   consideration for that fact.

14             MR. HIRSCHHORN:  A lifetime of good deeds.  The

15   give-back into the community is far more than, I respectfully

16   suggest, he took out.  And you heard his humble statement.

17   Every word of that was written by him.  I had nothing to do

18   with the preparation of that statement.

19             THE COURT:  I appreciate that.  I believe Mr. Inniss

20   expressed some sincere thoughts about where he is and what led

21   him to be here today, and where he hopes to go in the future.

22   I've not questioned his sincerity, or whether his lawyer

23   directed his statement.

24             Mr. Inniss is well-educated, he's eloquent, and he

25   spoke very sincerely about his view of the situation.

1           Was the Government finished?

2           MR. MOODY:  Yes, your Honor.

3           THE COURT:  Was there anything else from you, sir?

4           MR. HIRSCHHORN:  No, your Honor.

5           THE COURT:  Mr. Inniss did submit a number of

6    letters from friends and family, and has friends and family

7    here today.  I want to thank all of you for taking the time

8    from your busy schedules and difficult circumstances to write

9    a letter in support of Mr. Inniss.

10          Certainly I've had the opportunity to observe Mr.

11   Inniss throughout these proceedings.  He's conducted himself

12   very appropriately.  And what I do want to say is that your

13   letters have given me a more full, holistic picture of

14   Mr. Inniss.

15          He stands convicted in this court of three serious

16   federal offenses.  But every person is more than the worse

17   thing they've ever done.  I recognize that Mr. Inniss has a

18   distinguished career.  He's worked hard.  He comes from humble

19   beginnings.  His father was a fisherman, his mother a

20   homemaker.  He was one of eight children.  He rose through his

21   own hard work and efforts through the educational ranks and

22   became a well-regarded, well-known member of Parliament and

23   Minister.  It is unfortunate that those, that very

24   accomplished career, opened a door to the corrupt behavior

25   that led us to this day.

1     But I do want to say to everyone who wrote a letter,

2  that your letters are meaningful.  They've been read.  I've

3  thought hard about them and they factored into my

4  consideration as to the appropriate sentence to impose on

5  Mr. Inniss.  So thank you for your time.

6     The presentence report and the Government calculated

7  Mr. Inniss' guideline total adjusted offense level as 28.  His

8  criminal history category as a first-time offender is one.

9  The corresponding advisory guideline range of imprisonment is

10  between 78 and 97 months.

11     Defense counsel submits that the correct computation

12  of the guidelines should be a total adjusted offense level of

13  24, rather than 28, which results in an advisory guideline

14  range of sentence between 51 and 63 months in custody.

15     Specifically defense counsel disagrees and has

16  objected to the calculation on two grounds.  First, defendant

17  objects to two-level enhancement pursuant to Guideline

18  2C1.1(b)1, because the offense conduct involved more than one

19  bribe.  Second, defense counsel objects to a two-level

20  enhancement under Guideline 2S1.1(b)(2)(B) because the offense

21  involved sophisticated money laundering.

22     The Probation Department has rejected this objection

23  and the Government agrees with the Probation Department's

24  position.

25     With respect to the first objection, the Government

1   responds that as the evidence at trial demonstrated,

2   Mr. Inniss agreed to accept, and did accept, two distinct

3   bribe payments from the Insurance Corporation of Barbados

4   Limited, ICBL.  I think parties have been referring to this as

5   IBCL, but in fact it is ICBL, Insurance Corporation of

6   Barbados Limited.

7           The corresponding application note of Section

8   2C1.1(b)1 states that, quote, "related payments that in

9   essence constitute a single incident of bribery or extortion

10  e.g. a number of installments payments or a single action, are

11  to be treated as a single bribe or extortion."  The United

12  States Court of Appeals for the Second Circuit, which controls

13  here, ruled in *United States v. Arshad*, 239 F.3rd 276 at page

14  281, decided in 2001, that quote, "multiple payments meant to

15  influence more than one action should not be merged together

16  for purposes of Section 2C1.1 merely because they share a

17  single overall goal or are part of a larger conspiracy to

18  enrich a particular defendant or enterprise."

19          Although the two payments to Mr. Inniss involved the

20  same actors, I find that they should not be merged together as

21  one bribe.

22          The Second Circuit held the same in *United States v.*

23  *Soumano*.  In Soumano the defendant had contacted the Social

24  Security Administration claims representative to acquire

25  Social Security cards for undocumented individuals.  The

1    claims representative contacted federal officials and a sting

2    operation was implemented.  The sting involved two meetings.

3    And each time the defendant provided money in exchange for

4    Social Security cards.  The Second Circuit held that although

5    the method of payment was the same each time, the two bribes

6    had occurred because the payments were not installments and

7    were meant to influence two separate actions.

8         The Soumano court applied three factors to determine

9    whether a single bribe or multiple bribes were paid.  First,

10   whether the payments were made to influence a single action.

11   Second, whether the pattern and amounts of payment bear

12   hallmarks of an installment or partial payment of a fixed sum.

13   And third, whether the method for making each payment was the

14   same.  That's at 318 F.3rd at page 137.

15        I find that the bribes in this case were sought by

16   and paid to the defendant for separate incidents.  Both times

17   payments were made from ICBL through BF&M to an account in the

18   name of Crystal Dental Lab, also referred to as CDL.  But each

19   bribe payment to Mr. Inniss involved the award by the Barbados

20   Investment and Development Corporation, referred to here as

21   BIDC.  And that was a decision made by a Government board, the

22   members of which were appointed by Mr. Inniss.  Mr. Inniss in

23   effect controlled the BIDC board.

24        There were two separate ICBL contracts with terms

25   respectively of eight and a half months for the 2015 contract;

1    and one year for the 2016 contract.  Each of the two separate

2    bribe payments by ICBL to Mr. Inniss was calculated based on a

3    percentage of the premium amount of the policy that BIDC, the

4    Government agency, paid in exchange.  The BDIC paid for the

5    policy, and ICBL was awarded the policy and the premiums that

6    came with it after paying the bribes to Mr. Inniss.

7            Defense counsel also objects to the two-level

8    enhancement for sophisticated laundering under Guideline

9    2S1.1(b)(3) and contends that the defendant's money laundering

10   scheme was typical and not sophisticated.  Defense counsel

11   argues that Mr. Inniss' conduct, quote, "did not entail

12   multiple levels of layering or integration to disguise the

13   source of the proceeds," end quote.

14           The Government refutes defendant's objections to the

15   sophisticated means enhancement and argues that the guidelines

16   define sophisticated money laundering as, quote, "complex or

17   intricate offense conduct pertaining to the execution or

18   concealment of the 18 U.S. Code Section 1956 offense."  That's

19   Guideline 2S1.1(b)(3), comment note 5(A).

20           The guidelines note that sophisticated money

21   laundering often involves fictitious entities, shell

22   corporations, two or more levels of transactions, or offshore

23   financial accounting.  The Government contends that Mr. Inniss

24   used several of these methods to warrant the two-level

25   enhancement to a sentence.

1     This money laundering scheme involves a level of

2   sophistication to warrant the two-level enhancement as to

3   Mr. Inniss' guideline calculations.

4     As the defendant did in *United States v. Abdullaev*,

5   761 F. App'x 78 at 86, decided by the Second Circuit Court of

6   Appeals in 2019, Mr. Inniss also used his associate's dental

7   practice, Crystal Dental Lab, in a manner analogous to a

8   fictitious or shell corporation to make bribe payment

9   transactions appear legitimate and to cover his tracks, which

10  amounted to a sophisticated transaction.

11    As we know, in order for the insurance company to

12  obtain the award of the contract from the Barbadian Government

13  agency, executives there created a fictitious invoice from the

14  dental lab.  Concern that it should not appear on the books of

15  the Barbadian company, the invoice was sent to the parent

16  company in Bermuda.  So the fake invoice for non-existent

17  consulting services, were created by ICBL payable to the

18  Crystal Dental Lab.  Payments were made then by ICBL's parent,

19  BF&M in Bermuda, and payments were wired to the Crystal Dental

20  Lab bank account here in New York for which Mr. Inniss

21  provided account information.  The funds deposited by BF&M,

22  the parent company, to the Crystal Dental Lab bank account

23  were then transferred to the Bank of America account in the

24  name of Mr. Inniss.

25    Defendant also, quote, "employed multiple layers of

1   laundering by using offshore accounts in Barbados and in

2   Bermuda to send laundered funds to his New York accounts."

3   This further justifies a two-level enhancement.  See *United*

4   *States v. Amaris-Caviedes,* 701 F. App'x 84 at 86, decided by

5   the Third Circuit in 2017.

6           Is there anything further that Mr. Inniss objects to

7   regarding the presentence report?

8           MR. HIRSCHHORN:  No, your Honor.

9           THE COURT:  I will now review the factual background

10  that led us to this sentencing today, then I will

11  independently calculate the total adjusted offense level and

12  Mr. Inniss' criminal history category under the advisory

13  guidelines, which are not binding on the Court but I must give

14  them respectful consideration.

15          In August 2019 Mr. Inniss was charged in a

16  three-count second Superseding Indictment with conspiracy to

17  commit money laundering, Count One, in violation of 18 U.S.

18  Code Section 1956(h).  And two counts of money laundering in

19  violation of 18 U.S. Code Section 1956(a)(2)(A).

20          Between August 2015 and April 2016, Mr. Inniss,

21  using his position as a member of Parliament and the Minister

22  of Industry of the Government of Barbados, engaged in a scheme

23  to accept $36,536.73 in bribes from Ms. Inniss, who was then

24  CEO of the Insurance Corporation of Barbados Limited, ICBL.

25  And Mr. Tasker, then-senior Vice President of ICBL, in

1   violation of Barbadian law.  The proceeds of these bribes were

2   the laundered to and through the United States.

3          Mr. Inniss using his official position as Minister

4   of Industry caused the Barbados Investment and Development

5   Corporation, a Government agency of Barbados and over which

6   Mr. Inniss exercised authority, to renew two insurance

7   companies with ICBL.  These are two separate contracts with

8   two separate terms, and two separate amounts.

9          In July 2015 Mr. Inniss caused the BIDC to renew an

10  insurance contract with ICBL.  And the 2015 contract required

11  the BIDC to pay a premium of approximately $661,469.30 in

12  Barbadian dollars, or roughly $330,734.65 to ICBL.  In return,

13  ICBL employees, including the other two defendants, agreed to

14  pay a bribe of approximately 16,536.73 U.S.  to Mr. Inniss in

15  consideration of his role in causing the BIDC to renew the

16  2015 contract.

17         This bribe represented 5 percent of the total

18  premium that the Government and BIDC owed to ICBL under the

19  2015 contract.  Again these are public funds of the people of

20  Barbados.

21         In concealment of the bribe, Mr. Inniss arranged to

22  launder the bribes through a bank account in the Eastern

23  District of New York in the name of Crystal Dental Lab.

24  Payment was routed from Crystal Dental Lab to accounts of

25  Mr. Inniss at Bank of America located in Brooklyn.

1    On August 17, 2015, ICBL's parent company, BF&M

2 Limited in Bermuda, transferred $16,536.73 to the Crystal

3 Dental Lab bank account in New York based on a false invoice

4 purported consulting services that CDL did not actually

5 provide.

6    On August 19, 2015, Crystal Dental Lab transferred

7 approximately $50,000 to a bank account in the name of

8 Mr. Inniss via check payable to Mr. Inniss.

9    In March 2016, Mr. Inniss caused the BIDC to renew

10 another insurance contract with ICBL.  In return, ICBL

11 employees agreed to pay an additional bribe of approximately

12 $20,000 to Mr. Inniss.  Again, this is via an invoice that

13 Mr. Inniss provided based on the prior transaction, in

14 consideration for having caused the BIDC to renew the 2016

15 contract with ICBL.

16    On April 18, 2016, the parent company, BF&M Limited

17 transferred approximately $20,000, the amount requested by

18 Mr. Inniss in his invoice, the fake invoice, to the Crystal

19 Dental Lab bank account based on a false invoice for purported

20 consulting services that were never provided.

21    On April 25, 2016, Crystal Dental Lab made transfers

22 of approximately $9,000 and $8,000 to bank accounts in the

23 United States in the name of Mr. Inniss via checks made

24 payable to Mr. Inniss.

25    I would add an interesting note, that in the United

1   States, transactions that are $10,000 must be reported.  These

2   transactions were under $10,000 and were transferred to

3   Mr. Inniss from the Crystal Dental Lab bank accounts.

4           On April 27, 2016, Crystal Dental Lab transferred

5   approximately $2,750 to a bank account in the United States in

6   the name of Mr. Inniss via a check made payable to Mr. Inniss.

7           I have independently applied the 2018 advisory

8   guidelines to calculate the offense level and guidelines range

9   here.  Upon respectful consideration of those guidelines and

10  the presentence report, I compute Mr. Inniss' offense level

11  and adjustments as follows.

12          For violation of 18 U.S.C. Code Section 1956, the

13  money laundering statute, the Court looks to Guideline 2S1.1,

14  which directs the base offense level to be derived from the

15  guideline for the underlying conduct if the defendant

16  committed the underlying conduct and the offense level for

17  that offense can be determined.  The underlying conduct is

18  receiving a bribe, which provides an initial base offense

19  level of 14.  Because the instant offense involved $36,536.73

20  in laundered funds, there is a factual basis for finding that

21  Mr. Inniss laundered more than $15,000.  Thus, an additional

22  four levels are added pursuant to advisory Guideline

23  2C1.1(b)(2).

24          Because Mr. Inniss engaged in more than one bribe,

25  an additional two levels are added under Guideline

1  2C1.1(b)(1).

2          Finally because Mr. Inniss used his position as the

3  Minister of Industry of Barbados in furtherance of the

4  offenses, the offense level is increased by four levels

5  pursuant to 2C1.1(b)(3).  The final base offense level is thus

6  24.

7          With regard to specific offense characteristics,

8  Mr. Inniss was convicted of conduct covered under 18 U.S. Code

9  Section 1956, that results in two levels being added under

10  Guideline 2S1.1(b)(2)(B).  Because the offense involves

11  sophisticated laundering, the offense level is increased by

12  two levels under Guideline 2S1.1(B)(3).

13          There are no adjustments for victims or obstruction

14  or related adjustments.  No adjusts for acceptance of

15  responsibility.

16          We end up with a level 28 as the offense level.

17          According to the presentence report, Mr. Inniss has

18  no prior criminal convictions apart from the instant offense.

19  Therefore, under Guideline 4A1.1 and the sentencing table of

20  the advisory guidelines, Mr. Inniss has a criminal history

21  category of one.  There are no other charges that need to be

22  dismissed here.  He was convicted of all charges set forth in

23  the Indictment.

24          If there is anything else the parties would like me

25  to consider before we move forward I'm happy to do so.

SENTENCING

1          MR. HIRSCHHORN:  No, your Honor.

2          MR. MOODY:  No, your Honor.

3          THE COURT:  I'll now review the sentencing options

4     under the criminal code and the advisory guidelines.

5          The maximum term of imprisonment for a violation of

6     18 United States Code, Section 1956A2A and 1956H is 20 years.

7     There is no minimum term.

8          According to the advisory sentencing table of the

9     guidelines, the Court has independently calculated a range of

10    sentence for an adjusted offense level of 28, and criminal

11    history category of one, resulting in a range of sentence

12    between 78 to 97 months.

13         Under the Criminal Code 18 U.S. Code Section

14    3583(b)(2), if a term of imprisonment is imposed, a supervised

15    release term of not more than three years may be imposed.

16    Because the offense of is a Class C felony, the guidelines for

17    supervised release is between one and three years under

18    Guideline 5D1.2(a)(2).

19         Mr. Inniss, as we know, has requested probation.

20    The offenses in this case are Class C felonies.  Mr. Inniss is

21    eligible for between one and five years of probation Under 18

22    United States Code, Section 3561(c)(1).

23         Unless extraordinary circumstances exist, the Court

24    must also impose a fine, restitution or community service as a

25    condition of a probation under Section 3563(a)(2).

1      Because the applicable guideline range is in Zone D

2    of the sentencing table, Mr. Inniss is not eligible for

3    probation under Guideline 5B1.1, comment two.  The statute, 18

4    U.S. Code Section 1956(a)(2)(A) and 18 United States Code

5    Section 3571(b)(1) provides for a maximum fine of $500,000.

6    According to Guideline Section 5E1.2(c)(3) the recommended

7    fine is between $25,000 to $250,000.

8      I am permitted under the guidelines to excuse

9    Mr. Inniss from paying a fine if I find that he is not able to

10   pay a fine and not likely to be able to pay a fine.  I believe

11   the presentence report and Mr. Inniss' submissions have

12   established that Mr. Inniss is not likely to be able to pay a

13   fine and does not have current ability to pay a fine.  Nor the

14   Probation Department nor the Government have indicated that

15   restitution should be imposed here because no victim or loss

16   has been identified.  The PSR does note, however, that

17   restitution would be mandatory if such a victim had been

18   identified.

19     Mr. Inniss was subject to an order of forfeiture.

20   He consented to the forfeiture in the full amount of

21   $36,536.73.  That amount has been ordered and I ask whether

22   Mr. Inniss has paid any of his forfeiture obligation?

23     MR. HIRSCHHORN:  He has not, your Honor, upon my

24   advice, only because it seems to me to have been inconsistent

25   with his attempt to take an appeal.

SENTENCING

1    THE COURT:  The forfeiture will be made part of the

2    judgment, so he may appeal that as well if he wishes to do so.

3    Under 18 U.S. Code Section 3013 a $100 mandatory

4    special assessment must be imposed on each count of

5    conviction.  He was convicted of three counts and, therefore,

6    he owes $300 in mandatory assessments.

7    Are there any other matters that either Mr. Inniss

8    or the Government wish to raise at this time?

9    MR. HIRSCHHORN:  Your Honor, depending where your

10   sentence is, I have a request for recommendations.

11   THE COURT:  I will hear from you in a moment on

12   that.  I do want to advise Mr. Inniss of his right to appeal

13   since we know that is what you wish to do, sir.

14   You must appeal your sentence within 14 days of

15   judgment being entered in your case.  We may not be able to

16   enter judgment today, but we believe we can do so by tomorrow.

17   If you cannot afford to pay the filing fee for an appeal, and

18   you'll have to establish that you are in fact indigent without

19   any funds, you may apply for leave to file your appeal without

20   paying the fee if you can establish that you are indigent.  If

21   you request, the Clerk of the Court will prepare and file a

22   notice of appeal on your behalf.

23   I would ask defense counsel to take all necessary

24   steps to protect his client's right to appeal and to have

25   counsel on appeal.  Will you do that, sir?

1    MR. HIRSCHHORN:  Yes, of course.

2    THE COURT:  Fourteen days from judgment being

3    entered.

4    Is the Government in possession of any property that

5    Mr. Inniss had at the time of his arrest that must be

6    returned?

7    MR. MOODY:  Not that I'm aware of.

8    MR. HIRSCHHORN:  Nothing other than his passport.

9    THE COURT:  The passport will be held until the

10   entire sentence is satisfied, that includes any supervised

11   release term.

12   In determining the sentence I've given respectful

13   consideration to the advisory guidelines, which are not

14   mandatory or even presumptively reasonable, as counsel points

15   out.  I have considered the factors in addition to the

16   guidelines that are set forth in the criminal code 18 U.S.

17   Code Section 3553(a) 1 through 7.

18   First, I've considered the nature and circumstances

19   of Mr. Inniss' offenses and find that his offenses are

20   serious.  Specifically, in his role as a high-ranking public

21   official of the country of Barbados.  He conspired with others

22   to conduct one or more monetary transactions involving at

23   least one financial institution in and effecting interstate

24   commerce, while he knowingly received proceeds from the

25   unlawful activity of bribing, soliciting and receiving bribes,

1  in violation of 18 U.S. Code Section 1956.

2          Through money laundering Mr. Inniss received two

3  bribes totaling $36,536.73 in exchange for causing the BIDC

4  board to award insurance contracts to ICBL.

5          Second, I've also considered Mr. Iniss' personal

6  characteristics, family history and circumstances.  Again, he

7  has a lot to be proud of.

8          He was born in Barbados and January 1st, 1966.  He's

9  one of eight children born to the marital union of Joseph and

10  Jasmine Inniss.  Mr. Inniss grew up in poor, yet stable and

11  loving family circumstances free from any abuse.  Both of

12  defendant's parents have passed away.  His father was a

13  fisherman, as we noted.  Mr. Inniss has maintained good

14  relationships with all of his six siblings.  One sibling

15  resides in New York, the others reside in Barbados.

16          Mr. Inniss married Gail Williams Inniss in Barbados

17  on July 15, 2000.  Together they have two children ages 19 and

18  24.  Ms. Williams Inniss is not currently employed, although

19  she has experience as a phlebotomist.

20          Mr. Inniss holds a Master's degree in Business

21  Administration from the University of the West Indies in

22  Barbados.  And he's currently enrolled in an online doctorate

23  program through Walden University in Michigan.

24          Mr. Inniss resided in Barbados until 1994, when he

25  moved to New York City until 1996.  In 1996 he then returned

1  to Barbados until 2000.  And since 2000 he has traveled back

2  and forth between Barbados, New York City, and Tampa.  And has

3  had a permanent resident status in the United States.

4  Mr. Inniss is currently resides in his home in Tampa, Florida.

5          Mr. Inniss' family was reportedly in Barbados and

6  had been unable to return back to Tampa because of the

7  COVID-19 pandemic.  It appears at least his wife was able to

8  return.

9          Mr. Inniss was arrested in Middle District of

10  Florida on August 6, 2018, for the instant offense.

11          On January 16, 2020, he was found guilty by a jury

12  of the three counts of the second Superseding Indictment,

13  including one count of money laundering conspiracy and two

14  counts of a money laundering.

15          Mr. Inniss asserts that he has health concerns

16  including Type II diabetes, hypertension, and high

17  cholesterol.  He's prescribed a variety of medications for

18  each of these conditions.

19          Mr. Inniss does not have a history of mental illness

20  or emotional problems.  He does not have a history of illicit

21  abuse or alcohol abuse.

22          Mr. Inniss has devoted years of public service to

23  the people of Barbados.  He served as a member of Parliament

24  and Minister of Industry International Business Commerce and

25  Small Business in Barbados from 2008 through May 2018.  I

1  believed he also served the Barbados Foreign Service for a

2  short period as advice counsel.

3          Mr. Inniss received a salary of $70,000 per year in

4  his role as Minister.  Mr. Inniss has not been employed since

5  May 2018, but he receives a pension of $2,300 per month from

6  his position as Minister of Industry from the Barbadian

7  Government.  According to Pretrial Services Mr. Inniss

8  maintains a monthly income of $2,300.  His monthly expenses

9  total approximately $2,456.  He has several lines of credit

10  and his total net worth is approximately $57,965.  Based on

11  his financial profile, again, he appears unable to pay a fine.

12  The Government has not identified victims who would be

13  entitled to restitution.

14          I've considered all of the letters of support for

15  Mr. Inniss' family members and friends.  He's described as a

16  caring father who serves as a role model to his sons.

17          Mr. Brathwaite, former Attorney General of Barbados,

18  from 2010 to 2018, has known Mr. Inniss over 44 years.  And

19  has stated that he is generous and socially responsible.  He

20  also spoke very eloquently on behalf of his friend here today.

21          Terrence Inniss, Mr. Inniss' brother, described

22  Mr. Inniss as one of the most engaging and enlightening

23  politician of his era.  The President of Barbados Association

24  of Central Florida, Dale Husbands, stated that Mr. Inniss is,

25  quote, "instrumental in assisting in the development of the

1    Barbados diaspora in middle Florida by bringing members

2    together for social and charitable events, fundraising, and

3    soliciting support from both private and public sectors in

4    Barbados."

5         Ms. Shelly Weir, an NGO management specialist in

6    Barbados, provided the Court with background as to Mr. Inniss'

7    charitable contributions during his tenure as the Minister of

8    Industry in Barbados.

9         All of this speaks well and has been given serious

10   consideration by the Court.

11        I've also considered the policy statement issued by

12   the sentencing commission the need to avoid unwarranted

13   sentencing disparities.  And I believe the Government makes a

14   good point about general and specific deterrence as another

15   factor that I must consider.

16        It is important that generally the public know that

17   illicit proceeds, of whatever origin, not be laundered through

18   the United States financial institutions.  As we know, the

19   United States Convention Against Corruption has described the

20   ills of corruption, among others, "corruption is an insidious

21   plague that has a wide-range effects on societies.  And

22   undermines democracy and the rule of law could lead to

23   violations of human rights, distorts markets, here the

24   insurance market, erodes the quality of life, and allows

25   organized crime, terrorists, and other threats to human

1　security to flourish."

2　　　　The evil of corruption is found in all countries,

3　unfortunately.  Corruption undermines the Government's ability

4　to instill faith in its institutions and to provide basic

5　services.  So I believe that even the United Nations

6　recognizes the harmful effects of corruption in whatever form

7　it takes when high-ranking Government officials use their

8　office to illicit illegal bribes and then launder those

9　proceeds through the United States financial institutions.

10　　　　I've considered, as I said, all of the factors under

11　3553(a) one through seven.  As we know, the guidelines call

12　for a sentence between 78 to 97 months in custody.  Probation

13　recommends 78 months on each count to run concurrently.

14　Probation also recommends two years of supervised release on

15　each count to run concurrently with special conditions, which

16　include that defendant provide U.S. Probation with full

17　disclosure of financial records, including co-mingled income,

18　expenses, assets and liabilities, and include yearly income

19　tax returns.  That Mr. Inniss cooperate with the Probation

20　Department in signing appropriate documentation for release of

21　financial information.  And that he cooperate with the

22　immigration authorities.  And if he is deported or excluded

23　from the United States, he cannot reenter the United States

24　illegally; that is, without first seeking permission from the

25　United States Government.

1    Probation also notes that Mr. Inniss must pay the

2  $300 mandatory special assessment.  It should be due and

3  payable immediately.  I hope it will be paid soon.

4    The Government requests the same sentence

5  recommended by probation.

6    Defense counsel requests that I impose probation

7  only with community service.

8    After giving respectful consideration to the

9  advisory guidelines and all the factors set forth 18 United

10 States Code section 3553(a), I will impose a sentence that

11 falls below the advisory guidelines and is sufficient but not

12 greater than necessary to effect the goals of sentencing, and

13 specifically, punishment and deterrence.  In imposing such a

14 sentence I've considered the serious nature of Mr. Inniss'

15 offense while he was a high-ranking public official.  And the

16 need to promote respectful for the law, the Government, and

17 its institutions, and the United States financial

18 institutions.

19   Also, there is a need to ensure deterrence for those

20 tempted to participate in similar money laundering crimes.

21   I've considered Mr. Inniss' age, medical conditions,

22 which I believe are adequately treated or treatable by the

23 Bureau of Prisons.  I am glad to hear that Mr. Inniss has

24 received his Covid vaccine.  And I hope that he will remain

25 protected from that virus.  I recognize that he has some

1    underlying condition that pose concerns.

2          I have considered Mr. Inniss' charitable work, his

3    educational background, his family ties, and his stature

4    within the Government and the country of Barbados.  I take

5    very seriously his statement of remorse and regret.  And his

6    sorrow that he has suffered harm to his reputation, his

7    political aspirations and most poignantly the harm that he

8    caused to his family who have worried about him.

9          As required by 3553(a) 1 through seven, I have

10   considered the kinds of sentences available, all of the

11   circumstances relevant to sentencing, the sentences available

12   and the sentencing ranges established for the applicable

13   category of defendant set forth in the advisory guidelines.

14   Again, I believe the sentence will avoid unwarranted

15   sentencing disparities.  Accordingly I am authorized to find

16   in, and do find, all of the factors appropriate for a

17   determination of sentence as follows:

18         I sentence Mr. Inniss to a sentence of 24 months in

19   custody.  We will discuss the surrender date and designation

20   in a moment.  He will serve two years of supervised release

21   with the following special conditions.  He must provide

22   probation and the United States Government with complete and

23   truthful disclosure of his financial records including

24   personal and business co-mingled income expenses, assets, and

25   liabilities.  And include yearly personal and business income

1   tax returns, except for the financial accounts already

2   recorded and noted within the presentence report, Mr. Inniss

3   is prohibited from maintaining or opening any additional

4   individual or joint checking or savings or other financial

5   accounts for either personal or purposes without first

6   advising and gaining approval from the Probation Department.

7   Mr. Inniss shall cooperate with the Probation Officer in the

8   investigation of his financial dealings and shall provide

9   truthful monthly statements of his income and expenses.

10  Mr. Inniss shall cooperate in the assigning of any necessary

11  authorizations to release information forms pertaining to the

12  U.S. Probation Department's access to financial information

13  and records.

14          He shall cooperate and abide by all instructions of

15  immigration authorities.  And if he is deported or excluded,

16  he may not reenter the United States illegally.

17          I will not impose a fine.

18          The forfeiture order in the amount of $36,500.73 has

19  been so ordered and will be incorporated into the judgment.

20          I will not impose restitution.

21          However, he must pay immediately the $300 mandatory

22  special assessment.

23          Counsel, did you want to be heard about a surrender

24  date and place of designation?

25          MR. HIRSCHHORN:  In light of the fact that

1   Mr. Inniss intends to take an appeal, I would request, first,

2   that he be permitted to remain on liberty on the existing

3   bond.  Should he fail to file -- should I fail to file -- a

4   notice of appeal, then of course, that would change and he

5   would have to surrender.  So I also request that he be

6   permitted to voluntarily surrender to the institution

7   designated.

8           And I request that you recommend -- and I know it's

9   only a recommendation to the Bureau of Prisons -- that

10  Mr. Inniss be designated either to a federal prison camp or to

11  an FCI low, whichever he qualify for.  He may not qualify for

12  a camp because he's a non-citizen.  Those rules are somewhat

13  amorphous these days because of what is going on in the

14  country with COVID-19.  I would first request a recommendation

15  to a federal prison camp or alternatively to FCI low.

16          THE COURT:  Without preference to geographical

17  areas?

18          MR. HIRSCHHORN:  I'm sorry.  Yes, in close proximity

19  to his home, which is in Tampa, Florida, which would raise

20  three possibilities:  Either Florida or Alabama, Montgomery,

21  Alabama.  Or in Florida it would be Pensacola.  I don't know

22  if Coleman still has a -- is the closest.

23          THE COURT:  I'll just say that he be designated to a

24  facility in either Florida or Alabama, and they will know

25  which.

1          MR. HIRSCHHORN:  Fine.

2          THE COURT:  Let's talk about surrender date.

3          MR. HIRSCHHORN:  I would ask that the Court consider

4    permitting him to remain on bond pending appeal.  And if the

5    appeal is not successful when the mandate comes down, that he

6    be required to surrender within four to six months -- weeks --

7    after the mandate to the institution designated.

8          THE COURT:  Does the Government have a view on any

9    of the requests?

10          MR. MOODY:  Your Honor, as to the request to remain

11   free pending appeal, we object to that request.  The other

12   requests we don't take a position.

13          MR. HIRSCHHORN:  I can't hear you.

14          MR. MOODY:  We object to your first request that he

15   remain free pending appeal.  As to the other requests, we take

16   no position.

17          THE COURT:  Are you asking him to be remanded today?

18          MR. MOODY:  No, your Honor.  We're amenable to a

19   reasonable surrender date.

20          THE COURT:  Is there a reason why allowing him to

21   remain at liberty pending his appeal presents a risk of flight

22   or harm to the public?

23          MR. MOODY:  May we have one moment, please?

24          THE COURT:  Yes.  He has appeared at all court

25   ordered conferences.

1          MR. MOODY:  Your Honor, I believe the standard for

2    remaining free pending appeal is quite high.  I don't think --

3          THE COURT:  Is what?

4          MR. MOODY:  Sorry about the mask.

5          The standard for requesting remaining free pending

6    appeal is quite high.  We don't think the defendant has

7    satisfied that.

8          THE COURT:  You think he's not likely to prevail on

9    his appeal.

10         MR. MOODY:  Correct, your Honor.  That's our

11   position.

12         THE COURT:  I understand that.  But nonetheless, it

13   seems to me that he has not given us any objective concern for

14   risk of flight or danger to the public.

15         MR. MOODY:  Would your Honor consider briefing that

16   issue for you, doing research on it?

17         MR. HIRSCHHORN:  I can't hear, counsel.

18         MR. MOODY:  Would your Honor permit us to submit a

19   brief explaining our position on this issue?

20         THE COURT:  I understand the standard is a high

21   standard, a difficult standard to meet.  But in other cases

22   the Government typically does agree to allow someone at least

23   to be at liberty for some period, either pending appeal or

24   until his or her surrender.

25         MR. MOODY:  I'm sorry if we were unclear.  We are

SENTENCING

1  amenable to a reasonable surrender date, if it's weeks or

2  something reasonable.  We just we oppose to him remaining at

3  liberty for the length of an appeal, which can be a very long

4  period of time.

5          MR. HIRSCHHORN:  I don't know how long this appeal

6  process will take, your Honor.  I handled probably 125 appeals

7  in federal court, including in the Second Circuit.  The

8  transcript has been printed.  It was a short trial.  I can't

9  speak for the Second Circuit's docket, but this is not a case

10 that's going to require extension upon extension to get an

11 appellate brief done.

12         THE COURT:  I do think that if we were to provide

13 three months for Mr. Inniss to surrender -- I will set a

14 surrender date three months from now, which brings us to

15 July 30, to the designated institution, usually it is by

16 2:00 p.m.  And Mr. Hirschhorn, you will be asked to confirm on

17 August 2 that your client has surrendered on July 30.

18         MR. HIRSCHHORN:  I'll be asked to confirm what?

19         THE COURT:  Confirm by ECF, by letter, by August 2

20 that your client has surrendered.

21         MR. HIRSCHHORN:  Usually the Marshals -- I'll be

22 glad to do it, but usually the Marshals e-files an execution

23 of service but I'll be glad to do that.

24         THE COURT:  That's what I'm asking you to do, sir.

25 I'm ordering you to do it.

1          So August 2, 2021, Mr. Hirschhorn will confirm

2     surrender at the designated facility.

3          Is there anything else I should address?

4          MS. SHWEDER:  I couldn't hear, but I just wanted to

5     confirm what your Honor had said about the amount of

6     forfeiture, I just couldn't hear it.

7          THE COURT:  I said $36,536.73, which is the amount

8     in the forfeiture order; and coincidentally the amount of the

9     total bribes received.

10          MS. SHWEDER:  Thank you, your Honor.  I just

11     couldn't hear.

12          THE COURT:  Anything else I need to address at this

13     time?

14          MR. MOODY:  Nothing from the Government, your Honor.

15          THE COURT:  Mr. Hirschhorn?

16          MR. HIRSCHHORN:  No.  As I understand it, hopefully

17     the U.S. Bureau of Prisons will have advised me and/or

18     Mr. Inniss as to the institution designated by July 30.  And

19     if they have, I will notify the Court that he has surrendered.

20     If they haven't, we'll deal with it as we deal with it.

21          THE COURT:  Well, you'll let me know if they haven't

22     designated him by July 30.  You might let me know a week in

23     advance and the Government will confirm how that is going.  We

24     will take whatever other appropriate steps might be necessary.

25          I wish Mr. Inniss well, good health, and I suppose

1  good luck with your appeal as well.  You do have the right to

2  file one and you've got 14 days to do so.  Thank you.

3      Anything else?

4      MR. MOODY:  Nothing from the Government, your Honor.

5      MR. HIRSCHHORN:  No, your Honor.

6      THE COURT:  Thank you.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25