United States District Court
Eastern District of New York

----------------------------------X

United States of America,

   - against -                        **Memorandum and Order**

Donville Inniss,                     No. 18-cr-134 (KAM)

               Defendant.

----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

     After a four-day trial, a jury convicted Donville Inniss on
January 16, 2020, of two counts of money laundering and one
count of conspiring to commit money laundering.  On April 27,
2021, the Court sentenced Mr. Inniss to twenty-four months of
imprisonment.  Mr. Inniss, proceeding *pro se*, moves to vacate
his conviction under 28 U.S.C. § 2255 on the ground that his
attorneys were constitutionally ineffective.  (ECF No. 154, Mot.
Vacate ("Mot."), at 4-5.)  For the reasons below, the Court
respectfully denies Mr. Inniss's motion.

**Background**

     Mr. Inniss was the Minister of Industry for the Republic of
Barbados from 2013 to 2018.  In that role, he oversaw the
Barbados Investment and Development Corporation ("BIDC") and
appointed its directors.  The charges in the instant case
stemmed from two bribes Mr. Inniss took from the Insurance

Corporation of Barbados Limited ("ICBL") in 2015 and 2016 in exchange for influencing BIDC to award insurance contracts to ICBL.  The ICBL funds paid to Mr. Inniss were laundered through "Crystal Dental Lab," a Long Island company owned by Mr. Inniss's friend, and deposited into Mr. Inniss's personal bank accounts in the United States.

## I.   Factual Background

The Court draws the following facts from the consecutively paginated trial transcript, (ECF Nos. 137–140), which the Court cites as "Tr. ___."

In 2014, BIDC divided its insurance contracts between three companies, allocating a fifty percent share to ICBL, a thirty percent share to Consumers' Guarantee Insurance Company Limited ("CGI"), and a twenty percent share to Trident Insurance Company Limited ("Trident").  (Tr. 296:3–8.)  In March 2015, as BIDC decided how to allocate its insurance for the next year, BIDC's management recommended that BIDC maintain these allocations. (*Id.* 297:1–9.)  The recommendation was not final, however, and the market was competitive.  Government contracts were a large part of ICBL's business, and ICBL had been losing government business to competitors throughout 2015.  (*Id.* 156:18–157:20.)

On June 3, 2015, ICBL's Senior Vice President of Business Development and Marketing, Alex Tasker, texted Mr. Inniss, "We need to talk."  (*Id.* 244:13–14.)  The next day, Mr. Inniss asked

2

BIDC's CEO when the board would decide on its insurance allocations. (*Id.* 244:23-245:6.) The CEO responded that a subcommittee would present a recommendation at BIDC's June 2015 board meeting. (*Id.* 245:7-19.) On June 11, 2015, after BIDC received proposals from insurance brokers, BIDC's management again recommended that BIDC maintain its allocations. (*Id.* 298:9-18.) On June 22, 2015, however, BIDC's board abruptly changed course, awarding seventy percent of its business to ICBL, awarding thirty percent to CGI, and eliminating Trident entirely. (*Id.* 299:1-19.)

In July 2015, ICBL's CEO, Ingrid Innes,* met with Mr. Inniss. (*Id.* 166:20-167:23.) Following the meeting, Ms. Innes emailed Tasker and ICBL's Chief Underwriting Officer, Goulbourne Alleyne, that "[h]e has given instructions to proceed with the insurance contract." (*Id.* 169:5-12.)

### A.    First Bribe

On July 31, 2015, Tasker asked Alleyne to confirm ICBL's "portion of the premium," (*id.* 178:2-15), and Alleyne responded that it was seventy percent, (*id.* 179:1-12). Over the next week, Tasker and Mr. Inniss texted about setting up a meeting. (*Id.* 273:1-275:15.) On August 9, 2015, Tasker texted Mr. Inniss to "drop off the letter in the a.m." (*Id.* 275:16-276:1.) The

---

* To avoid confusion, the Court distinguishes between "Ms. Innes" and "Mr. Inniss," who are not related to each other.

3

next day, Mr. Inniss sent himself an email titled "Bank," which contained bank account information for "Crystal Dental Lab," a Long Island company run by Mr. Inniss's close friend, Roger Clarke. (*Id.* 276:5-277:16, 281:24-285:14.)

Later that day, Ms. Innes called ICBL's CFO, Kamante Millar, into her office to meet with her and Tasker. (*Id.* 42:12-23.)  Ms. Innes told Millar that they had to make an urgent "referral bonus" payment to Mr. Inniss, falsely stating that ICBL's Chairman, John Wight, had authorized the payment. (*Id.* 43:18-20, 43:7-10, 118:24-119:6.)  Millar returned to her office, where Tasker handed her a paper containing bank account information for Crystal Dental Lab, which Tasker told her was Mr. Inniss's company in the United States. (*Id.* 51:4-20.) Millar asked him for the "premium" and "rate" so she could calculate Mr. Inniss's "commission." (*Id.* 54:7-14.)  After receiving that information and performing the calculation, Millar wrote "$16,536.73 U.S." on the paper. (*Id.* 54:15-25, 56:11-12, 57:16-20.)  That amount was precisely five percent of the value of the insurance contract BIDC had just awarded ICBL. (*Id.* 344:16-345:4.)

Millar then generated an invoice from Crystal Dental Lab to ICBL requesting $16,536.73 for "consulting services." (*Id.* 61:18-64:5.)  That description was false.  Crystal Dental Lab, a Long Island dental office, had not actually been providing

4

consulting services to ICBL, a Barbadian insurance company. (*See id.* 188:25–189:5.)  Millar suggested to Ms. Innes that ICBL make the payment through its Bermuda-based parent company, BF&M Limited, to avoid Barbadian exchange controls, which would have delayed the payment by several weeks.  (*Id.* 47:8–48:22.) Ms. Innes called BF&M to request that it assist with completing the payment, and Millar emailed the invoice to BF&M.  (*Id.* 50:10–51:3.)  Over the next week, Millar, Ms. Innes, and Tasker corresponded with BF&M by email regarding the status of the payment.  (*Id.* 66:22–73:18.)

On August 17, 2015, Millar emailed BF&M to follow up on the payment and ask if there was anything BF&M could do to expedite it.  (*Id.* 74:7–75:5.)  Ms. Innes later informed Millar and Tasker that BF&M was "check[ing] on the status and get it expedited if it ha[d] not be[en] paid."  (*Id.* 75:6–76:19.)  That day, BF&M wired $16,536.73 to Crystal Dental Lab's bank account in the United States.  (*Id.* 340:25–341:22.)  Tasker then emailed the chain that "[t]he client called" and was "happy that it is okay."  (*Id.* 75:20–76:2.)  Two days later, Crystal Dental Lab deposited a $16,000 check into Mr. Inniss's personal bank account.  (*Id.* 348:18–349:5.)

### B.   Second Bribe

On April 5, 2016, four days after ICBL's 2015 contract with BIDC expired, Mr. Inniss sent an email titled "crystal invoice"

5

from his personal account to Tasker's personal account. (*Id.* 248:13-249:3.)  The email attached a purported invoice from Crystal Dental Lab to ICBL charging $20,000 for "consultancy services." (*Id.* 249:4-250:5.)  Tasker then approached Millar and told her that the business Mr. Inniss referred was up for renewal and that ICBL would have to pay him another "referral bonus." (*Id.* 76:3-17.)  When Millar performed the calculations and noted that the "commission" did not amount to an even $20,000, Tasker explained that they had decided to "round" the payment amount. (*Id.*)  Millar then generated a second fake invoice from Crystal Dental Lab to ICBL charging $20,000 for "consulting services." (*Id.* 77:15-80:10.)

On April 7, 2016, Millar sent the invoice to ICBL's parent company for payment. (*Id.* 80:11-23.)  She replied to the same email chain she had used in August 2015 regarding the first payment, attaching the second fake invoice and explaining to BF&M that she had "another payment similar to the last." (*Id.*)  On April 11, 2016, Ms. Innes forwarded Tasker the invoice, asking him to "verify that [it had been] paid only for ICBL's portion ASAP." (*Id.* 83:24-84:10.)  Millar followed up later that day, asking Tasker if there had been "any word on this" and that ICBL had to "confirm the BFM payment on [its] behalf." (*Id.* 84:11-24.)  Tasker then emailed Millar a BIDC document noting ICBL's seventy percent share of BIDC's insurance for

6

2016, which Millar used to calculate the payment.  (*Id.* 86:13–88:17.)

On Friday, April 15, 2016, Ms. Innes emailed BF&M that ICBL was "under the gun to pay that invoice and wonder[ed] how soon it could be done."  (*Id.* 97:14–24.)  BF&M responded later that day, noting that the payment had been processed and that the wire would be released Monday, April 18, 2016.  (*Id.* 98:3–13.)  On April 18, 2016, BF&M wired $20,000 to Crystal Dental Lab's bank account in the United States.  (*Id.* 356:5–357:13.)  The next week, Crystal Dental Lab deposited three checks amounting to $19,750.  Each of the three checks was deposited into a different personal bank account of Mr. Inniss.  (*Id.* 358:7–359:9.)

In October 2016, BF&M's CFO informed Wight about BF&M's "unusual" 2015 and 2016 payments to Crystal Dental Lab, which Wight had not approved.  (*Id.* 143:14–144:8.)  Wight called Ms. Innes at her office, where Tasker and Millar were also present, and interrogated Ms. Innes and Tasker about the transactions.  (*Id.* 144:9–16.)  When they equivocated, he accused them of paying bribes and hung up.  (*Id.* 101:16–103:4.)  Ms. Innes slouched over, put her hands in her hair, and exclaimed, "[O]h my God.  I can get fired for this."  (*Id.* 103:4–6.)

## II.  Procedural Background

On March 15, 2018, a grand jury in the Eastern District of New York indicted Mr. Inniss, charging him with two counts of money laundering (one for each bribe) and one count of conspiring to commit money laundering.  (ECF No. 1, Indictment.) Specifically, the Indictment alleged that Mr. Inniss conspired to, and did, transfer funds from Barbados to the United States with the intent to promote violations of the Foreign Corrupt Practices Act and the Barbados Prevention of Corruption Act. (*Id.*)  Mr. Inniss was arrested in August 2018 at the Tampa International Airport, where Roger Clarke, the owner of Crystal Dental Lab, had arrived to pick him up.  (Tr. 309:8–310:4.)

The Government filed a Superseding Indictment on August 28, 2018, which added Ms. Innes and Tasker as defendants.  (ECF No. 13, Superseding Indictment.)  The Government filed a Second Superseding Indictment on August 1, 2019, which removed the Foreign Corrupt Practices Act allegations and left the Barbados Prevention of Corruption Act violations as the sole predicate offenses supporting the money laundering and money laundering conspiracy charges.  (ECF No. 50, 2d Superseding Indictment.)

Before trial, the Government moved to preclude Mr. Inniss from introducing any evidence that Barbadian authorities had not charged him with a crime.  (ECF No. 39, Gov't's Pre-Tr. Mots., at 7–10.)  Mr. Inniss declined to oppose the motion,

8

acknowledging that "the decisions of local law enforcement [were] plainly irrelevant to the charges" and that he had no "intention to raise such issues." (ECF No. 43, Decl. of A. Ricco, at 3.) The Court granted the Government's motion, agreeing that independent decisions by the Barbadian authorities were irrelevant to whether Mr. Inniss engaged in the charged criminal conduct. (*See* ECF No. 86, Dec. 20, 2019, Mem. & Order, at 19–21.)

The Court held a jury trial from January 13, 2020, to January 16, 2020, at which the Government called Millar, Wight, Alleyne, FBI Special Agent Stephanie Krug, and an FBI forensic accountant as witnesses. (*See* Tr. 24:6–369:20.) The Government also introduced internal documents from BIDC and ICBL, emails and text messages, wire transfer records, and bank records. (*See id.*) Mr. Inniss declined to testify or call any of his own witnesses. (*Id.* 377:16–19.) At summation, Mr. Inniss's primary argument was that the Government failed to prove Mr. Inniss exerted any influence on BIDC to renew or enlarge ICBL's contract. (*See id.* 474:21–475:7.) Rather, Mr. Inniss's attorneys suggested that BIDC underwent a rigorous "vetting process" and reached the "right conclusion" about how to allocate its insurance contracts based on the relative merits of the insurers. (*See id.* 474:7–15.)

On January 16, 2020, the jury convicted Mr. Inniss on all

three counts.  (ECF No. 106, Verdict.)  Mr. Inniss filed a post-
trial motion for a judgment of acquittal, (ECF No. 112-1, Mem.
Supp. Def.'s Mot. J. Acquittal), which the Court denied on
July 24, 2020, (ECF No. 115, July 24, 2020, Mem. & Order).  On
April 27, 2021, the Court sentenced Mr. Inniss to twenty-four
months of imprisonment, to be followed by twenty-four months of
supervised release.  (ECF No. 132, Judgment.)  The Second
Circuit affirmed Mr. Inniss's conviction on October 5, 2022.
(ECF No. 153, Mandate.)  Mr. Inniss completed his term of
imprisonment on February 1, 2023, and was turned over to
Immigration and Customs Enforcement ("ICE") pending his
deportation to Barbados.  (ECF No. 161, May 18, 2023, Ltr. from
G. Leon.)

On February 13, 2023, while in ICE custody, Mr. Inniss
filed the instant *pro se* motion to vacate his conviction under
28 U.S.C. § 2255.  (Mot. 4–5.)  On March 27, 2023, Mr. Inniss
was deported to Barbados, where he technically remains on
supervised release but is not being actively supervised by the
Probation Department.  (*Id.* 5; ECF No. 173, Dec. 22, 2023, Ltr.
from G. Leon ("Opp'n"), at 5.)  Mr. Inniss filed a memorandum in
support of his Section 2255 motion to vacate his conviction on
September 5, 2023, (ECF No. 164, Mem. Respect 2255 Mot.
("Mem.")), and a supplemental memorandum on November 14, 2023,
(ECF No. 170, Suppl. Mem. Supp. Mot. Post-Conviction Relief

10

("Suppl.")).  The Government opposed the motion on December 22, 2023, (Opp'n), and Mr. Inniss filed his reply on February 26, 2024, (ECF No. 176, Verified Reply Supp. Mot. Post-Conviction Relief ("Reply")).  The motion is now fully submitted and ripe for adjudication.

### Legal Standard

A person in federal custody may collaterally challenge his or her conviction or sentence under 28 U.S.C. § 2255 by filing a motion to vacate in the district court that imposed the sentence.  28 U.S.C. § 2255(a).  Relief is generally available only for a constitutional error, lack of jurisdiction, or a fundamental defect that inherently results in a miscarriage of justice.  *Nnebe v. United States*, 534 F.3d 87, 90 (2d Cir. 2008).

*Pro se* filings are held to less rigorous standards than counseled filings.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A *pro se* motion under Section 2255 is construed liberally to raise the strongest arguments it suggests.  *Waiters v. United States*, 472 F. Supp. 3d 7, 13 (E.D.N.Y. 2020).  Still, *pro se* litigants are not exempt from the applicable substantive and procedural law.  *Mejia v. Sup't, Elmira Corr. Facility*, 702 F. Supp. 3d 83, 93 (E.D.N.Y. 2023).

### Discussion

Mr. Inniss's motion raises four grounds for relief, all

11

based on alleged deficiencies in his two trial attorneys'
performance.  (Mot. 5-8.)  Mr. Inniss's supporting memorandum
discusses two other issues that the Court in an abundance of
caution will construe as additional claims due to Mr. Inniss's
*pro se* status.  (*See* Mem. 7-8.)  Mr. Inniss's supplemental
memorandum includes an additional claim that Mr. Inniss suffered
a constructive denial of counsel during pre-trial proceedings
and at trial.  (*See generally* Suppl.)

Mr. Inniss's reply contains sixteen separate argument
sections. (*See generally* Reply.)  The Court has considered
Mr. Inniss's reply insofar as it bears on the seven claims
raised in his prior submissions.  To the extent Mr. Inniss seeks
to raise any new claims in his reply, the Court declines to
address them.  A party waives any argument that he or she raises
for the first time in a reply brief, even if the party is
proceeding *pro se*.  *Gribbin v. N.Y. State Unified Court Sys.*,
838 F. App'x 646, 648 n.1 (2d Cir. 2021) (mem.); *Farmer v.
United States*, No. 15-cv-6287 (AJN), 2017 WL 3448014, at *3
(S.D.N.Y. Aug. 10, 2017) (denying reconsideration of holding
that *pro se* defendant waived arguments first raised in reply in
support of Section 2255 motion).

Before addressing the merits of Mr. Inniss's claims,
however, the Court addresses how Mr. Inniss's submission of his
motion while in ICE custody and his subsequent deportation to

12

Barbados affect the Court's jurisdiction to adjudicate

Mr. Inniss's motion.

I.   **Jurisdiction**

The Court has an "independent obligation to determine

whether subject-matter jurisdiction exists" at all stages of a

proceeding, "even in the absence of a challenge from any party."

*Chapman v. DOJ*, 558 F. Supp. 3d 45, 48 (E.D.N.Y. 2021) (quoting

*Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)).  Though the

circumstances of Mr. Inniss's motion raise two potential

jurisdictional problems, the Court ultimately concludes that it

has subject-matter jurisdiction to adjudicate the motion.

A.   **"In Custody"**

First, even though Mr. Inniss had completed his term of

imprisonment when he filed his motion, he still was "in custody"

at that time.  A person may only seek Section 2255 relief if the

person is "in custody."  28 U.S.C. § 2255(a).  The "in custody"

requirement is jurisdictional, meaning that the Court may not

adjudicate the motion if the requirement is not met.  *United

States v. Rutigliano*, 887 F.3d 98, 104 (2d Cir. 2018).  So long

as the requirement was met "[a]t the time [the] defendant[]

filed the [Section 2255] motion[]," however, the defendant's

subsequent release from custody will not necessarily divest the

court of jurisdiction.  *Id.*

Here, Mr. Inniss was "in custody" within the meaning of

13

Section 2255(a) at the time he filed his motion because he was in ICE detention and under supervised release.  *See Cai v. United States*, No. 13-cv-3617 (ARR), 2013 WL 5934314, at *3 (E.D.N.Y. Nov. 1, 2013) (concluding defendant satisfied § 2255(a)'s "in custody" requirement where he was in ICE custody and under supervised release); *see also Douglas v. United States*, No. 08-cv-4728 (FB), 2009 WL 1322328, at *1 (E.D.N.Y. May 13, 2009) (same); *United States v. Brumigin*, No. 03-cr-910 (CPS), 2007 WL 3353510, at *2 (E.D.N.Y. Nov. 7, 2007) (same). Further, Mr. Inniss's "subsequent release from physical confinement" when he was deported to Barbados "does not necessarily negate [the] Court's jurisdiction to adjudicate his motion," as the "in custody" requirement is assessed at the time the motion is filed.  *See Wing v. United States*, No. 00-cv-2389 (DGT), 2007 WL 3034210, at *3 (E.D.N.Y. Oct. 15, 2007).

**B.  Mootness**

Second, Mr. Inniss's deportation to Barbados did not moot his motion, even though the Probation Department is not actively supervising him there.  A Section 2255 motion becomes moot if at any stage of the proceedings it ceases to raise a justiciable case or controversy.  *Kamagate v. Ashcroft*, 385 F.3d 144, 150 (2d Cir. 2004).  Even where a formerly incarcerated defendant is released and deported, however, there still may be a justiciable case or controversy if the defendant will suffer immigration-

14

related collateral consequences as a result of his or her conviction. *Id.* at 150-51 (finding justiciable case or controversy existed where "a judicial ruling in [petitioner's] favor could remedy the alleged injury of a lifetime bar from reentry with no possible cancellation of removal").

Here, under *Sibron v. New York*, 392 U.S. 40 (1968), the Court must presume that Mr. Inniss's conviction in the instant case resulted in adverse collateral consequences that a favorable decision could redress because Mr. Inniss challenges his conviction, not just his sentence. *See Perez v. Greiner*, 296 F.3d 123, 125 n.4 (2d Cir. 2002) (applying *Sibron* presumption to deported habeas petitioner); *compare United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir. 1999) (refusing to apply *Sibron* presumption to deported defendant who did "not challenge his conviction" and "contest[ed] only a sentencing enhancement"). The Government does not dispute that the *Sibron* presumption applies, nor has it attempted to rebut the presumption. (*See generally* Opp'n.)

Notwithstanding the *Sibron* presumption, there may be collateral consequences in the instant case because Mr. Inniss's money laundering conviction renders him inadmissible to the United States, *see* 8 U.S.C. § 1182(a)(2)(I)(i), and Mr. Inniss has no other criminal history that independently would render him inadmissible, (*see* ECF No. 117, Presentence Investigation

Report, ¶¶ 40-45).  Thus, a favorable decision might redress
Mr. Inniss's "injury of a lifetime bar from reentry" into the
United States.  *See Kamagate*, 385 F.3d at 151.

Accordingly, the Court concludes that it has subject-matter
jurisdiction to adjudicate Mr. Inniss's motion and proceeds to
consider the merits of Mr. Inniss's claims.

## II.  Ineffective Counsel Claims

Mr. Inniss's ineffective counsel claims implicate the Sixth
Amendment to the federal Constitution, which guarantees a
criminal defendant the right "to have the [a]ssistance of
[c]ounsel for his [or her] defen[s]e."  *See* U.S. Const.
amend. VI.  In *Strickland v. Washington*, the Supreme Court
interpreted "assistance" to mean "effective" assistance.
466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S.
759, 771 n.14 (1970)).  An attorney renders ineffective
assistance if he or she (1) performs below objectively
reasonable professional standards (2) in a way that prejudices
the defendant.  *Farhane v. United States*, 77 F.4th 123, 126
(2d Cir. 2023).  Prejudice occurs only when there is a
substantial likelihood that the result of the proceeding would
have been different but for the attorney's deficient
performance.  *Garner v. Lee*, 908 F.3d 845, 862 (2d Cir. 2018).

### A.  Deficiency

Mr. Inniss alleges that his attorneys were deficient in six

16

different ways.  (*See* Mot. 5–8; Mem. 7–8.)  For the reasons below, the Court finds that Mr. Inniss failed to establish that his attorneys rendered deficient performance in any respect.

### 1.  Mr. Inniss's Legal Authority to Influence BIDC

Mr. Inniss first claims that his attorneys were deficient because they "[f]ail[ed] to analyze . . . pertinent laws of Barbados [that] would establish that [Mr. Inniss] did not have the authority to influence or issue a contract."  (Mot. 5.)  A criminal defense attorney has a "duty to investigate" the relevant facts and law.  *See* 466 U.S. at 690.  A "failure to make a meritless argument," however, "does not rise to the level of ineffective assistance."  *Guzman v. United States*, 363 F. Supp. 3d 396, 399 (S.D.N.Y. 2019) (quoting *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995)).  Accordingly, "choosing not to . . . 'investigate' a meritless claim" also is not ineffective assistance.  *Sebbern v. United States*, No. 10-cr-87 (AMD), 2021 WL 1210312, at *6 (E.D.N.Y. Mar. 31, 2021) (quoting defendant's motion).

Here, Mr. Inniss's attorneys' alleged failure to investigate the theory that Mr. Inniss had no actual authority to issue or influence BIDC's contract to ICBL was not deficient performance because that theory was meritless.  Mr. Inniss's authority to influence BIDC was irrelevant to his guilt or innocence.  To convict Mr. Inniss on all three charges, the jury

17

was only required to find that Mr. Inniss did – and conspired to – transfer funds from outside the United States to inside the United States with the intent to promote "specified unlawful activity." *See* 18 U.S.C. § 1956(a)(2)(A).  The "specified unlawful activity" the Government alleged was violations of the Barbados Prevention of Corruption Act.  (ECF No. 50, 2d Superseding Indictment, ¶ 24); *see* 18 U.S.C. § 1956(c)(7)(B)(iv) (defining "specified unlawful activity" to include "an offense against a foreign nation involving . . . bribery of a public official").  The Barbados Prevention of Corruption Act in turn imposes criminal liability on a public official who corruptly receives money "as an inducement to, reward for[,] or otherwise on account of doing or forbearing to do anything." (Tr. 533:17–534:4.)  It does not require that "the public official actually performed the act or refrained from performing the act in question." (*Id.* 535:5–7.)

Given this governing law, Mr. Inniss's criminal liability did not depend on whether he had "the authority to influence or issue a contract." (*See* Mot. 5.)  As the Government correctly explains, Mr. Inniss could have violated the Barbados Prevention of Corruption Act even if he tricked officers at ICBL into believing that he could influence the BIDC contracts when he really had no power to do so. (*See* Opp'n 8.)  Thus, because the particulars of Barbadian law that Mr. Inniss cites regarding his

18

technical legal authority over BIDC's insurance contracts were irrelevant to his guilt or innocence, Mr. Inniss's attorneys were not deficient by declining to investigate them.

### 2.   BIDC's Bidding Process

Mr. Inniss next claims his attorneys were deficient because they "[f]ail[ed] to present evidence that the [BIDC] contract was awarded via public tender, management recommendations[,] and decisions of [the] Board of Directors" and that Mr. Inniss was "not involved." (Mot. 5.) The trial transcripts themselves belie this claim. The defense elicited ample testimony about how the BIDC contract was awarded. (*See, e.g.*, Tr. 199:8–10 (asking Alleyne whether ICBL "would sit down with members of the Government and explain to them what benefits the Government would receive by doing business with ICBL"); *id.* 314:2–8 (asking Agent Krug whether the documentary evidence suggested that BIDC had a "vetting process" for insurers, whether "[t]here were recommendations made" by management, and whether "the board of BIDC made a decision").) Then, at summation, the defense argued to the jury at length that BIDC made a merits-based decision to award ICBL more business and that the Government failed to prove Mr. Inniss was involved in that decision. (*See id.* 455:2–474:15.) Because Mr. Inniss's attorneys made the "public tender" defense one of their key trial themes, they cannot be deemed ineffective on the ground that they "failed to present"

19

that defense.

### 3.  Mr. Inniss's List of Witnesses

Mr. Inniss next claims his attorneys were deficient because they failed to investigate "a listing of potential witness, titles[,] and roles and likely testimony evidencing that [Mr. Inniss] was not involved in the selections of insurers" and did not "witness those decisions."  (Mot. 6.)  Mr. Inniss's memorandum elaborates that "[s]uch witnesses included the Chairman and Deputy Chairman of the BIDC as well as individuals who are very experienced in matters related to politicians and corporate donors in Barbados."  (Mem. 6.)  Mr. Inniss does not identify any witness by name, nor does he state any specific testimony the unnamed witnesses might have offered at trial.

This claim fails because Mr. Inniss's allegations lack the necessary precision.  To prevail on a *Strickland* claim based on an "alleged failure to investigate . . . potential witnesses," Mr. Inniss has the burden to "demonstrate that the witnesses would have testified at trial and explain the expected nature of the witnesses' testimony."  *Dollison v. Nassau Cty.*, No. 17-cv-2804 (JFB), 2019 WL 3531522, at *9 (E.D.N.Y. Aug. 2, 2019) (quoting *Taylor v. Poole*, No. 07-cv-6318 (GWG), 2009 WL 2634724, at *14 (S.D.N.Y. Aug. 27, 2009)).  Mr. Inniss's "conclusory allegations regarding his counsel's alleged failure to call witnesses in his defense [are] unsupported by any

20

factual allegations of any such witnesses or what exculpatory testimony they would have offered." *See id.* at *10. Thus, Mr. Inniss has not met his burden to establish that his attorneys' performance was deficient for not investigating these unnamed witnesses. *See Carneglia v. United States*, No. 03-cv-6388 (ADS), 2006 WL 148908, at *4 (E.D.N.Y. Jan. 18, 2006) (denying Section 2255 motion where defendant had "not provided "affidavits from the potential witnesses nor any assurance that they would have appeared at trial had counsel interviewed them").

Moreover, the one clue Mr. Inniss offers about the unnamed witnesses' expected testimony – that the witnesses would have testified that Mr. Inniss "was not involved" in BIDC's selection of insurers – suggests that their testimony would have been irrelevant. As explained above, (*supra* II.A.1), the Government was not required to prove that Mr. Inniss was involved in BIDC's selection of insurers to sustain convictions on any of the charges. Thus, Mr. Inniss cannot prevail on his ineffective counsel claim based on an alleged failure to investigate potential witnesses.

### 4. Purpose of ICBL's Payments to Mr. Inniss

Mr. Inniss next claims that his attorneys were deficient because they failed to present the defense that "the money received was a political contribution and not any other

21

purpose." (Mot. 8.) Again, the trial transcripts controvert this claim. The defense repeatedly suggested to Millar that Tasker "told [her] the [the] payments were as political payments," though Millar testified that she could not recall Tasker using those words. (Tr. 107:9–112:21.) The defense actually elicited testimony from Agent Krug that Millar indicated during her FBI interview "that she had informed [BF&M's CFO] that the $20,000 was . . . for a political payment." (*Id.* 316:20–322:11.) The defense also cross-examined Alleyne at length about ICBL's "donation budget." (*Id.* 202:7–204:9.) At summation, the defense argued that "the most important part of this [was] that [the Government had] to prove that a bribe took place here; not a political contribution, not what [Alleyne] called a donation, but a bribe." (*Id.* 452:20–23.) Based on the above testimony and argument, Mr. Inniss's argument that his attorneys failed to present his "political contribution" defense is meritless.

Mr. Inniss's argument that his counsel inadequately cross-examined Millar and Alleyne, (*see* Mem. 7), is equally meritless. An attorney's decisions about how to cross-examine a witness "generally will not support an ineffective assistance claim." *United States v. Choudhury*, 330 F. Supp. 3d 815, 854–55 (E.D.N.Y. 2018) (quoting *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002)). Mr. Inniss's hairsplitting criticisms that his

attorneys insufficiently cross-examined Alleyne about "ICBL['s] habit of . . . payments to politicians" and failed to "frontally address[]" Millar's "credibility and corrupt acts" during her cross-examination, (Mem. 7), are "precisely the kind of 'Monday morning quarterbacking' that *Strickland* reject[s]," *see United States v. Kelly*, 609 F. Supp. 3d 85, 156 (E.D.N.Y. 2022) (quoting *DiMattina v. United States*, 949 F. Supp. 2d 387, 414 (E.D.N.Y. 2014)).  Even the most skilled cross-examinations barely could have blunted the force of Millar's and Alleyne's devastating direct testimonies, and Mr. Inniss's counsel performed as well as could reasonably be expected under the circumstances.

Additionally, to the extent Mr. Inniss suggests there was any impropriety in Millar's non-prosecution agreement, (*see* Mem. 7), "[n]on-prosecution agreements are entirely routine" in federal prosecutions, *United States v. Raia*, No. 18-cr-657 (WJM), 2019 WL 5395041, at *3 (D.N.J. Oct. 22, 2019). Regardless, both the Government and the defense thoroughly questioned Millar about her non-prosecution agreement.  (*See* Tr. 39:23-41:4, 104:8-105:1.)

### 5.  Barbadian Law Enforcement Activities

Mr. Inniss's supporting memorandum adds a claim that his attorneys inadequately pursued evidence regarding an investigation by Barbadian authorities.  (Mem. 7.)  Before

trial, the Court granted the Government's motion to preclude Mr. Inniss from introducing such evidence because it was irrelevant. (*See* ECF No. 86, Dec. 20, 2019, Mem. & Order, at 19-21.) Mr. Inniss's attorneys had no obligation to obtain irrelevant and inadmissible evidence, so they did not render deficient performance by choosing to focus their efforts elsewhere. *See Barnes v. Burge*, 372 F. App'x 196, 201 (2d Cir. 2010) (summary order) (finding no *Strickland* error in attorney's failure to investigate witnesses whose testimony would have been inadmissible hearsay).

### 6. Mr. Inniss's Financial Condition

Finally, Mr. Inniss's supporting memorandum adds a claim that his attorneys were deficient because they failed to present evidence of his "financial health." (Mem. 7-8.) That evidence would have been irrelevant because the Government never advanced the theory that Mr. Inniss took bribes out of financial desperation. (*See* Tr. 411:2-447:21, 476:19-491:25.) An attorney does not render deficient performance by declining to present irrelevant evidence. *See Sparman v. Edwards*, 26 F. Supp. 2d 450, 473 (E.D.N.Y. 1996) (explaining that "there is no constitutional right to present irrelevant evidence"). Accordingly, Mr. Inniss cannot prevail on this claim.

### B. Prejudice

Even if the Court had deemed Mr. Inniss's attorneys'

24

performance deficient, Mr. Inniss would not prevail on his
motion to vacate because he failed to show that the alleged
deficiencies prejudiced him.  A court must reject an ineffective
counsel claim if the defendant fails to show prejudice,
regardless of whether the attorney's performance was deficient.
*United States v. Lin*, 511 F.3d 110, 120 (2d Cir. 2007).  A
defendant fails to show prejudice if the evidence against him or
her was "overwhelming."  *Id.*  Here, the Government presented
overwhelming evidence that Mr. Inniss accepted two bribes and
laundered the proceeds to his personal bank accounts in the
United States.

First, there was overwhelming evidence that Mr. Inniss
accepted the first bribe in consideration of ICBL's 2015
contract with BIDC.  After BIDC decided on its insurance
allocations for 2015, Tasker confirmed the value of the new
contract, texted Mr. Inniss about setting up a meeting, and then
reminded Mr. Inniss to "drop off the letter in the a.m."  (Tr.
273:1–276:1.)  The very next day, Mr. Inniss emailed himself the
bank account information for Crystal Dental Lab, which the jury
quite reasonably could have found was "the letter" Tasker
mentioned.  (*Id.* 276:5–277:16, 281:24–285:14.)  Later that day,
Tasker handed Millar a paper (*i.e.*, "the letter") with the same
bank information, which Millar used to generate a fake invoice
from Crystal Dental Lab for "consulting services" that charged

25

ICBL precisely five percent of the value of the contract BIDC
had just awarded ICBL.  (*Id.* 51:4–57:20, 61:18–64:5, 344:16–
345:4.)  That a Long Island dental office was "consulting" for a
Barbadian insurance company was proven to have been a lie, and
the jury properly declined to consider it a coincidence that
Crystal Dental Lab invoiced ICBL an *exact* fraction of the BIDC
contract.  Further, wire records confirmed that ICBL's parent
transferred that exact amount of money to Mr. Inniss's friend's
dental company in the United States the same day that Tasker
sent an email noting that "[t]he client called" and was "happy
that it is okay."  (*Id.* 75:20–76:2, 340:25–341:22.)  Bank
records then confirmed that within just two days, the dental
company deposited almost all of ICBL's payment into Mr. Inniss's
personal account.  (*Id.* 348:18–349:5.)

There also was overwhelming evidence that Mr. Inniss
accepted the second bribe in consideration of ICBL's 2016
contract with BIDC.  Less than a week after the 2015 contract
expired, Mr. Inniss sent Tasker information to generate another
invoice from his friend's dental company to ICBL charging
$20,000 for more consulting services.  (*Id.* 249:4–250:5.)
Though this sum was not a precise percentage of the 2016 BIDC
contract, it was close, and Tasker explained the discrepancy by
informing Millar that they had decided to "round" ICBL's 2016
payment to Mr. Inniss.  (*Id.* 76:3–17.)  Millar then generated

another fake invoice to Crystal Dental Lab, ICBL's parent again wired funds to Crystal Dental Lab, and Crystal Dental Lab again deposited almost all the wired money into Mr. Inniss's personal accounts in the United States.  (*Id.* 77:15–80:23, 98:3–13, 356:5–357:13, 358:7–359:9.)

Finally, though the Government did not even have to prove it to convict Mr. Inniss, (*see supra* II.A.1), there was ample circumstantial evidence indicating that Mr. Inniss did, in fact, influence BIDC to keep and enlarge ICBL's contract in 2015, *see United States v. Litwok*, 678 F.3d 208, 213 (2d Cir. 2012) (explaining that a defendant may be convicted solely based on circumstantial evidence).  While BIDC, a government corporation Mr. Inniss oversaw, was evaluating whether to keep its contract with ICBL in 2015, Mr. Inniss was texting with one of ICBL's officers.  (Tr. 244:13–14.)  At the same time, he was asking BIDC's CEO about upcoming board decisions about insurance allocations.  (*Id.* 244:23–245:19.)  Then, BIDC's board abruptly reversed two prior management recommendations and not only kept ICBL's contract but also gave ICBL an increased share of its insurance business.  (*Id.* 299:1–19.)  After BIDC made that decision, Mr. Inniss met with ICBL's CEO, who emailed her colleagues after the meeting that "[h]e has given instructions to proceed with the insurance contract."  (*Id.* 166:20–169:12.)

In sum, given the overwhelming evidence against Mr. Inniss,

27

none of the deficiencies he alleges regarding his attorneys'
performance, even taken together, could reasonably be expected
to have changed the outcome of Mr. Inniss's trial.  Thus,
Mr. Inniss has failed to establish prejudice and cannot prevail
on his *Strickland* claims.

## III. Constructive Absence Claim

Mr. Inniss's supplemental memorandum raises an additional
claim under *United States v. Cronic*, 466 U.S. 648 (1984), that
his attorneys were constructively absent from the pre-trial
proceedings and the trial.  (*See generally* Suppl.)  Under
*Cronic*, a court presumes that prejudice results when an
attorney's "mistakes [are] so pervasive that [the defendant], in
effect, ha[s] no counsel at all."  *United States v. Reiter*,
897 F.2d 639, 645 (2d Cir. 1990).

Mr. Inniss's *Cronic* claim is frivolous.  His attorneys
reviewed substantial discovery, engaged in extensive pre-trial
motion practice, competently cross-examined the Government's
witnesses, and presented the best theory they could in summation
given the veritable mountain of testimonial and documentary
evidence against their client.  Mr. Inniss's attorneys' advocacy
came nowhere near a *Cronic* error.  *Compare, e.g.*, *Gonzalez v.
United States*, 722 F.3d 118, 136 (2d Cir. 2013) (suggesting
*Cronic* error occurred in sentencing where attorney "did not act
as an advocate for [defendant] at all" and "did little more than

simply attend [defendant's] sentencing hearing").

## IV. Hearing

Mr. Inniss requests an evidentiary hearing on his claims. (Mem. 2.)  A hearing is necessary only when the defendant establishes a "plausible" claim of ineffective assistance. *United States v. Hild*, 644 F. Supp. 3d 7, 34 (S.D.N.Y. 2022) (quoting *United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993)).  A district court has discretion to deny a Section 2255 motion based on ineffective assistance of counsel without a hearing if the record itself provides a sufficient basis to deny the motion.  *Id.*

Here, the current record is sufficient to resolve Mr. Inniss's Section 2255 motion.  The undersigned judge observed Mr. Inniss's attorneys' performance during pre-trial proceedings and at trial, resolved Mr. Inniss's post-trial motion, and reviewed all the evidence Mr. Inniss submitted in connection with the instant Section 2255 motion.  Even assuming Mr. Inniss were to substantiate his proffered evidence at a hearing, he still would not be able to establish a Sixth Amendment violation.  Accordingly, the Court denies Mr. Inniss's request for an evidentiary hearing.

### Conclusion

For the reasons stated above, the Court respectfully denies Mr. Inniss's motion to vacate his conviction.  Because

Mr. Inniss failed to make a substantial showing of the denial of a constitutional right, the Court denies a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(2).  The Court also certifies in accordance with 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and thus denies *in forma pauperis* status should Mr. Inniss appeal.  *See Coppedge v. United States*, 369 U.S. 438 (1962).

The Government is respectfully requested to serve a copy of this Memorandum and Order on Mr. Inniss at his address as listed on the docket (or last known address) and to note service on the docket by August 28, 2024.

**So ordered.**

Dated:      August 27, 2024        **Kiyo A. Matsumoto**
            Brooklyn, New York     United States District Judge
                                   Eastern District of New York

30